James SIMON and Marilyn Simon,
Plaintiffs–Appellees and Cross–
Appellants,

v.

Rob COPPOLA, d/b/a Designer Spas and
Hot Tubs, Defendant–Appellee and
Cross–Appellee,

and

Eaton Corporation, Defendant–Appellant
and Cross–Appellee.

No. 91CA2101.

Colorado Court of Appeals,
Div. II.

Nov. 4, 1993.

As Modified on Denial of Petition for
Rehearing of Plaintiffs–Appellees and
Cross–Appellants Feb. 3, 1994.

Petition for Rehearing of
Defendant–Appellant and Cross–Appellee
Denied Feb. 3, 1994.*

Certiorari Granted June 27, 1994.

* Metzger, J., would Grant as to Part VI of the    majority opinion.

Pryor, Carney and Johnson, P.C., Elizabeth C. Moran, W. Randolph Barnhart, Mark D. Sullivan, Englewood, for plaintiffs-appellees and cross-appellants.

Kane, Donley & Shaffer, Jack E. Donley, Colorado Springs, for defendant-appellee and cross-appellee.

Fish & Coles, Kenneth R. Fish, Denver, for defendant-appellant and cross-appellee.

Fogel, Keating & Wagner, P.C., William L. Keating, Timothy F. Devereux, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Opinion by Chief Judge STERNBERG.

Defendant Eaton Corporation (manufacturer) appeals a judgment entered on a verdict finding it partially liable for the plaintiffs' injuries. Plaintiffs, James and Marilyn Simon (homeowners), cross-appeal. Defendant Rob Coppola, d/b/a Designer Spas and Hot Tubs, (Coppola) responds to both the appeal and cross-appeal. We affirm, but remand for allowance of costs.

In late 1987, the homeowners contracted with Tom and Bill Schnell, d/b/a Property Renovation Specialists, for the installation of a deck and a used hot tub. The Schnells in turn contracted with Coppola to inspect the tub's equipment pack and repair it as needed. The pack consisted of the heater, circulation equipment, and other controls. Greg Anderton, an employee of Coppola, installed new controls including a thermostat manufactured by Eaton.

Another Coppola employee, Jerry Wolf, installed the equipment pack in the tub at the home. Wolf set the thermostat at the half-way point. He told the Schnells and the homeowners that the tub would be warm enough to use that evening, but advised placing a solar blanket over it for the next few days to retain heat. He suggested cutting the blanket to fit the inside of the tub. The homeowners used the tub that evening and covered it with a solar blanket.

The next morning, Mrs. Simon went to the tub to cut the blanket. To do so, she rolled up her pants leg and started to step into the tub. As she did so, she realized the water was extremely hot and tried to pull back but lost her balance and fell into the tub immersing the lower half of her body in the water. She sustained second and third degree burns.

The homeowners filed suit against the manufacturer, Coppola, and two other defendants, alleging that the thermostat was defective. They brought claims founded in strict liability, breach of warranty, and breach of express and implied warranties of merchantability and fitness for a particular purpose. The homeowners alleged that Coppola was negligent in its installation of the thermostat and control pack in the tub.

When Coppola designated Tom and Bill Schnell, d/b/a Property Renovation Specialists, as nonparties at fault, the homeowners amended their complaint to add them as defendants. The homeowners subsequently settled with the Schnells before trial, but the Schnells remained designated nonparties at fault throughout the trial.

Coppola filed a petition in bankruptcy shortly after the suit was filed. An automatic stay was extended but later was lifted to the extent of his liability coverage. The homeowners again amended their complaint to include Anderton and Wolf as defendants.

The homeowners then entered into a covenant not to execute with Hawkeye Insurance Company on behalf of Coppola, Anderton, and Wolf. The homeowners accepted a $300,000 payment, dismissed their claims against Anderton and Wolf while retaining Coppola and Designer Spas as defendants,

and agreed not to execute on any judgment against Coppola personally in excess of $300,000.

After a three-week trial, the jury returned a verdict in favor of the homeowners on all four counts against the manufacturer. The verdict allocated 75% fault to the manufacturer and 12.5% fault each to nonparties Tom and Bill Schnell. The verdict found both Coppola and Mrs. Simon negligent but not liable, finding no causal connection between the negligence of either and the homeowners' damages. The jury awarded $850,000 to Mrs. Simon for economic and non-economic damages and $25,000 to Mr. Simon for loss of consortium.

After a hearing, the court reduced the verdicts by the 25% apportioned to the nonparties and awarded $637,500 to Mrs. Simon and $18,750 to Mr. Simon.

The manufacturer contends the court erred in several evidentiary rulings and in its calculation of damages with regard to the effect of the various pre-trial settlements. The homeowners cross-appeal, contesting the court's award of expert witness fees to Coppola. Coppola joins in the homeowners, response to the manufacturer's appeal and responds to the homeowners' cross-appeal.

I.

■ Contrary to the manufacturer's first contention, the trial court did not err in allowing a thermostat to be received in evidence for impeachment purposes.

The homeowners' theory against the manufacturer was that the thermostat installed in the tub had been defectively manufactured. The particular component of the thermostat claimed to be defective was known as an actuator. The homeowners contended that the defect in the actuator allowed the water to heat beyond the marked maximum of 115°F. Specifically, they alleged that the actuator, a metal bulb, had been defectively crimped during manufacture and that this defect altered the temperature sensing mechanism such that it allowed the water in the tub to heat to 180°F. The manufacturer maintained that any damage to the thermostat occurred after it left the factory.

The actuator involved was manufactured in 1985. The homeowners sought to introduce another thermostat manufactured in 1989 to impeach testimony of the manufacturer's expert who testified that it would be "bordering on [the] impossible" for the actuator bulb at issue to leave the factory in the condition alleged.

The manufacturer contends that the court erred in admitting the second thermostat, arguing that the differences between the two resulted in it not being substantially similar to the actuator at issue.

This second thermostat had been discovered by the homeowners shortly before trial was scheduled to begin. It had gone through quality control inspections at the factory, but it too overheated. An expert witness for the homeowners examined it and submitted an affidavit concluding that the actuator component of the thermostat was substantially similar to that in the homeowners' tub, even though the entire thermostat unit differed in several other ways.

The manufacturer moved *in limine* to exclude the second thermostat, arguing that it was not substantially similar and that, pursuant to CRE 403, any probative value was outweighed by the potential for unfair prejudice in its influence on the jury. The court denied the motion, ruling that the evidence was admissible as impeachment of the manufacturer's expert witness. It found that the CRE 403 argument went to factual issues, including the difference in the dates of manufacture and the differences in manufacture and materials. The court noted that the homeowners would still have to show at trial the substantial similarity between the actuators.

■ Evidence of other similar post-accident product failures is admissible upon a showing that the other accidents occurred under circumstances and conditions the same or substantially similar to the one involved in the present case. Such evidence is particularly relevant when the defendant contends that the alleged incident could not possibly have caused the complained-of injury. And, the court has discretion to determine the similarity and to weigh CRE 403 concerns

implicated by such evidence. *Koehn v. R.D. Werner Co.*, 809 P.2d 1045 (Colo.App.1990).

■ Any differences in the circumstances between the two occurrences goes to the weight to be given such evidence. *Ponder v. Warren Tool Co.*, 834 F.2d 1553 (10th Cir. 1987).

The court did not rule immediately on the motion *in limine*, preferring to wait until trial. Evidence concerning the second thermostat was introduced during testimony of the manufacturer's expert after he stated his opinion concerning the near impossibility for a thermostat to go through the manufacturer's testing procedures and still allow water to heat to 180°F and, his belief that the actuator at issue had not left the factory in the condition it was in at the time of the incident.

The record reflects that the court allowed substantial *voir dire* before permitting the introduction of the second thermostat, during which the manufacturer was afforded the opportunity to establish the differences between the two thermostats. We perceive no abuse of discretion in the court's decision. *See Koehn v. R.D. Werner Co., supra. See also Wheeler v. John Deere Co.*, 862 F.2d 1404 (10th Cir.1988) (evidence of other incidents admissible to impeach if proponent first shows similarity to product at issue).

## II.

We also disagree with the manufacturer's contention that the court erred in not directing a verdict on homeowners' claims of strict liability and breach of implied warranty of fitness for a particular purpose.

■ A motion for a directed verdict should be granted only if the evidence, considered in a light most favorable to the non-moving party, compels the conclusion that reasonable persons could not disagree, and when no evidence has been presented that could sustain a jury's verdict against the moving party. *United Bank v. One Center Joint Venture*, 773 P.2d 637 (Colo.App.1989).

■ To establish a prima facie case of strict liability based on a defective product, the plaintiff must show that the product: (1)

was defective and because of the defect was unreasonably dangerous; (2) the defect existed at the time the product was sold or left the defendant's control; (3) the product was expected to and did reach the plaintiff, an expected user, without substantial change in its condition; (4) the plaintiff was injured; and (5) the defect was a cause of the injury. *CJI–Civ.3d* 14:18 (1989).

■ Taken in the light most favorable to the homeowners, there was sufficient evidence in the record for a reasonable jury to conclude that the crimp in the actuator existed when it left the manufacturer's factory and that it rendered the thermostat defective and unreasonably dangerous by allowing the water to heat past the marked maximum temperature, that it reached the homeowners without substantial change, and that it was a cause of the homeowners' injuries.

*Shaw v. General Motors Corp.*, 727 P.2d 387 (Colo.App.1986) and other cases cited by the manufacturer are distinguishable. The products involved in those cases were not defective when they left the manufacturer, but either became components of allegedly defective finished products or were subject to misuse. Here, on the other hand, the actuator involved was alleged to be defective when it left the manufacturer's factory.

■ To establish a prima facie case for breach of implied warranty for fitness for a particular purpose, the plaintiff must show that: (1) the defendant sold and impliedly warranted the product to be fit for a particular purpose; (2) the plaintiff was reasonably expected to use the product; (3) the product was not suitable for the purpose warranted; and (4) the breach was a cause of the plaintiff's injuries. *See CJI–Civ.3d* 14:8 (1989).

■ Again, taken in the light most favorable to the homeowners, there was sufficient evidence in the record for a reasonable jury to conclude that the actuator was impliedly warranted by the manufacturer for use in hot tubs, that the homeowners could have been reasonably expected to use the thermostat and that, due to the defect, the product was not fit for such use and was a cause of the homeowners' injuries.

Accordingly, we perceive no error in the denial of the manufacturer's motion for directed verdict on these two claims.

### III.

·The manufacturer argues that the court erred in admitting two exhibits into evidence. We perceive no abuse of discretion.

■ Rulings on relevancy of evidence are within the sound discretion of the trial court and are not to be disturbed unless the record demonstrates an abuse of that discretion. *K.N. Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769 (Colo.1985). There was no such abuse here.

■ The first questioned exhibit was a thermostat manufactured in 1987 and purchased by the homeowners' expert during a pre-trial investigation. Although the actuator was not crimped as was the one at issue, it carried the same model number and functioned and operated the same way. It was admitted after the manufacturer's expert conceded in *voir dire* that the only significant difference was the absence of crimping which, he testified, would not affect the high end of the temperature range.

■ The second exhibit was a log of the results of final inspections of thermostats of the same model as the one at issue which were manufactured at the factory from 1984 to 1988. It showed that, in 1986, a lot of 200 thermostats had been rejected because the "crimp in actuator was too big."

The court concluded that the log "cut both ways" because it showed not only that the manufacturer's quality control program had discovered the problem but also the potential for error in the manufacturing process. The court also stated that the log would help the jury better understand the manufacturing process.

Under these circumstances, we conclude that the court did not abuse its discretion in admitting either exhibit. *K.N. Energy, Inc. v. Great Western Sugar Co., supra.*

### IV.

■ The manufacturer next contends that the court erred when it permitted Mrs. Simon's physician to offer certain medical opinions.

The physician was accepted as an expert in plastic and reconstructive surgery and the care of burn patients. He testified that he had discontinued a steroid treatment after Mrs.· Simon reported certain gynecological symptoms.

The manufacturer objected, claiming that matters concerning the area of gynecological and obstetrical medicine were outside the doctor's area of expertise. The court overruled the objection and allowed the testimony.· The doctor then explained his reasons for discontinuing the treatment.

The homeowners contend that the doctor did not seek to offer an expert opinion in gynecological and obstetrical medicine by testifying as to the causes of Mrs. Simon's symptoms, but rather gave his reasons for his course of treatment which were based on Mrs. Simon's physical responses to that treatment.

We agree with the homeowners and perceive no abuse of discretion in the court's evidentiary ruling. *See Publix Cab Co. v. Colorado National Bank*, 139 Colo. 205, 338 P.2d 702 (1959). *See also K.N. Energy, Inc. v. Great Western Sugar Co., supra.*

### V.

■ The manufacturer also asserts that the court erred in not allowing the jury to consider the potential liability of Anderton and Wolf and also in its decision not to inform the jury of the terms of the homeowners' settlement with them. We disagree with both contentions.

The manufacturer argues that the jury was permitted, either through inference or implication, to conclude that neither Anderton nor Wolf was liable. To the contrary, the record reflects that the jury instructions stated that both Anderton and Wolf were employees of Coppola acting within the scope and course of their employment at all relevant times. Consequently, the jury could have assigned

fault to either Anderton or Wolf or both and was instructed that, should it do so, any such liability should be attributed to Coppola.

Citing *Greenemeier v. Spencer*, 719 P.2d 710 (Colo.1986), the manufacturer argues that the court was required to advise the jury of the fact of the settlement between the homeowners and Anderton and Wolf. We conclude that *Greenemeier* does not mandate such action here.

In the *Greenemeier* ruling, the supreme court held that, in order to avoid jury speculation as to the fate of an absent person when the defendant is obviously not the only potentially liable person: "[I]n the usual case a jury should be advised of the fact of settlement, but not the amount." The court, however, made clear that it was not establishing an absolute rule. It left the decision to inform the jury to the discretion of the trial court, requiring only that, if a trial court determines that such an instruction is not appropriate, it must make a sufficient record to allow appellate review.

Here, the trial court determined that it could "best reach justice in this case" by deviating from *Greenemeier.* Given that Anderton and Wolf were included in the settlement reached with Coppola and that Coppola remained in the trial as a defendant, we agree with the trial court that justice was best served by not informing the jury of the settlement, allowing the jury to determine liability, and then making appropriate adjustments to the jury verdict.

Based on the circumstances of this case and the record made by the court, the court's decision not to give a *Greenmeir* instruction was not an abuse of discretion.

## VI.

We also disagree with the manufacturer's final assertion that the court erred in not crediting the amount of the homeowners' settlement with Coppola against the amount it owed as damages.

On a motion to amend judgment, the court considered whether it should reduce the judgment pursuant to either or both §§ 13–21–111.6 and 13–50.5–105, C.R.S. (1987 Repl. Vol. 6A). The court considered the relevant case law but ultimately determined that any reduction would produce a windfall for the manufacturer. It thus did not apply either statute and let the judgment stand without reduction by the amount of the settlement. The manufacturer argues that the court erred in this decision. We agree that the court should have applied § 13–50.5–105 but not § 13–21–111.6. We do not agree that such application would reduce the judgment.

### A.

In our view, § 13–21–111.6 is inapplicable to this case. That section requires the court to reduce the damage award by amounts that the plaintiff is "compensated for his loss by any other person, corporation, insurance company, or fund." The language of this clause evinces a clear intent that damages be set off by any collateral source contributions not specifically excepted by the second clause of the statute. *See Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070 (Colo.1992). The second clause provides that the verdict is not to be reduced by amounts the plaintiff receives as a result of a contract entered into and paid for by or on behalf of the plaintiff.

Thus, since the settlement payment was made by another "person or corporation," the general requirement of the collateral source statute mandates that the verdict be reduced by the settlement amount, unless the payment qualifies for the statutory exception. We conclude that a settlement accompanied by a release or covenant not to execute falls within the scope of the "contract" exception.

We note initially that Colorado courts have recognized that a compromise and settlement is a contract to end judicial proceedings. *H.W. Houston Construction Co. v. District Court,* 632 P.2d 563 (Colo.1981); *Recreational Development Co. v. American Construction Co.,* 749 P.2d 1002 (Colo.App.1987).

In *Van Waters & Rogers, supra,* the supreme court rejected the narrow interpretation that the exception applied only to contracts for which the plaintiff paid money. It there held that the exception applied to benefits received by fire fighters from a statewide

fund created by statute and to which neither the fire fighter nor his employer ever contributed. In so holding, it ruled that the exception is "broad enough to protect benefits that result from an employment contract for which a person gives consideration in the form of services." *Van Waters, supra,* at 1078.

The *Van Waters* court went on to construe the clause as "broad enough to cover contracts for which a plaintiff gives some form of consideration, whether it be in the form of money or employment services." *Van Waters, supra,* at 1079. And, it noted that its construction of the statute "serves the purpose of protecting benefits to which a person is entitled by virtue of that person's own efforts." *Van Waters, supra,* at 1079.

Here, the settlement and covenant not to execute were entered into and paid for by the homeowners. In exchange for the settlement payments, the homeowners surrendered their claims against the settling parties. As this case illustrates, that consideration was not insubstantial. By accepting $100,000 from the Schnells, for instance, the homeowners released the right to recover on the jury's verdict against the Schnells, which proved to be 25% of $875,000, or $218,750. Also, the settlements were negotiated for and resulted from the homeowners' own efforts in pursuing those claims. We conclude that payments received in connection with a covenant not to execute fall within the statutory exception to § 13–21–111.6 and, thus, do not reduce the amount of damages.

We recognize that application of *U.S. Fidelity & Guaranty Co. v. Salida Gas Service Co.,* 793 P.2d 602 (Colo.App.1989); *Gutierrez v. Bussey,* 837 P.2d 272 (Colo.App.1992); and *Smith v. Zufelt,* 856 P.2d 8 (Colo.App.1992) (*cert. granted* July 26, 1993), could lead to a different result. However, none of these decisions address whether the "contract" exception applies to releases or covenants not to execute. Therefore, in light of the supreme court's broad interpretation of "contract" in *Van Waters, supra,* the continuing vitality of these cases is open to question, and we choose not to follow them here.

B.

Section 13–50.5–105, C.R.S. (1987 Repl.Vol. 6A) provides, in pertinent part, that, when a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort, it does not discharge any other tortfeasor from liability. However, it reduces the aggregate claim against the other "to the extent of any degree or percentage of fault or negligence attributable by the finder of fact to the tortfeasor to whom the release or covenant is given." There is no right on the part of a tortfeasor who has not settled to choose, instead, a reduction in the actual amount paid in settlement.

Here, the jury determined that Coppola was 0% at fault. Consequently, the aggregate claim against the manufacturer should not be reduced by the amount of the settlement between the homeowners and Coppola. This result, as the supreme court has noted, furthers the overriding policy of the Uniform Contribution Among Joint Tortfeasors Act, § 13–50–101, et seq., C.R.S. (1987 Repl.Vol. 6A), of which this statute is a part.

> In light of these considerations, we believe that a refusal to reduce the judgment by the settlement amount is justified under the Act even if it results in overcompensation to the plaintiff, particularly since a contrary rule would defeat, in cases such as the present one, the Act's overriding goal of ensuring full compensation.

*Kussman v. City & County of Denver,* 706 P.2d 776, 781 (fn. 5) (Colo.1985) (interpreting prior version of § 13–50.5–105).

The manufacturer, however, argues that § 13–50.5–105 expressly applies only to persons found "liable in tort." Because Coppola was found to be 0% at fault, the manufacturer contends he was not found liable in tort within the meaning of § 13–50.5–105 and the statute is thus inapplicable.

This argument, however, ignores the historical context of the statute. That background indicates that the statute's focus is on the effect of the settlement payment at the time it is made and the character of the payment as one made because the alleged

tortfeasor faced exposure to being held "liable in tort" at trial.

Section 13–50.5–105 was enacted as part of Colorado's adoption of the Uniform Contribution Among Joint Tortfeasors Act in 1977. *See Stubbs v. Copper Mountain, Inc.,* 862 P.2d 978 (Colo.App.1993).

Under the original version of § 13–50.5–105, which also contained the phrase on which the manufacturer relies, an alleged tortfeasor who settled with a plaintiff to avoid exposure to liability at trial typically received a release of any further claims. As a result, the fact finder did not make *any finding* as to the fault or negligence of those who settled prior to trial. The only exception was in the unusual circumstance that a tortfeasor received a covenant not to execute and remained a defendant at trial. It was not until after the General Assembly amended the statute and concurrently enacted § 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A), in 1986, that a procedure was created for the fact finder at trial routinely to determine the liability of a tortfeasor who had settled before trial.

■ Because under the original statute there typically was no determination made at trial as to whether those who had settled were "liable in tort," the current statute should not be construed to require such a finding before a reduction in the amount of the settlement is permitted.

■ The more reasonable interpretation of the statute is that § 13–50.5–105, before and after its amendment, applies to those who pay compensation to an injury victim because they are facing exposure to being held "liable in tort" at trial, as distinct from those who provide payments from a collateral source, such as an insurance contract. *See Wong v. Sharp,* 734 F.Supp. 943 (D.Colo. 1990).

Such an interpretation is consistent with long recognized and well accepted tort principles:

Payments made by one who is not himself liable as a joint tortfeasor will go to diminish the claim of the injured person against others responsible for the same harm if they are made in compensation of that claim, as distinguished from payments from collateral sources such as insurance, sick benefits, donated medical or nursing services, voluntary continuance or wages by the employer, and the like. These payments are commonly made by one who fears that he may be held liable as a tortfeasor *and who turns out not to be.*

Restatement (Second) of Torts § 885 comment f (1979) (emphasis added); *see also* Restatement (Second) of Torts § 920A(1) (1979) ("A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability.").

Application of *Wesley v. United Services Automobile Ass'n,* 694 P.2d 855 (Colo.App. 1984), could lead to a contrary result; however, in our view, the vitality of that case has been eroded by the supreme court's decision in *Kussman v. City & County of Denver, supra,* decided the year after *Wesley. Cf. Smith v. Zufelt, supra.*

## VII.

In their cross-appeal, the homeowners contend that the court erred in awarding and disallowing various fees related to a witness for Coppola. We disagree.

Because Coppola's bill of costs included expenses of taking discovery depositions, the homeowners argue that the court erred when it allowed the entire amount requested by Coppola as fees for his expert witness. Over homeowners' objection, the court allowed as costs expert witness fees of $15,385.33 for trial preparation and $5,197.55 for trial testimony.

[20] A trial court has discretion in awarding costs for expert witnesses. Section 13–33–102(4), C.R.S. (1987 Repl.Vol. 6A); *Burt v. Beautiful Savior Lutheran Church,* 809 P.2d 1064 (Colo.App.1990). Moreover, expenses incurred in taking discovery depositions are allowed where the taking of the deposition and its general content were reasonably necessary for the development of the case in light of facts known to counsel at the

time it was taken. *Cherry Creek School District # 5 v. Voelker,* 859 P.2d 805 (Colo. 1993). Given this standard, we perceive no abuse of discretion in the trial court's order even though the record indicates a charge for deposition preparation for Coppola's expert.

■ The homeowners also contend that the court erred when it disallowed certain portions of their expert witness fees and various costs associated with the taking of a video deposition of an out-of-state witness. Under our view of *Cherry Creek School District # 5 v. Voelker, supra,* we agree and therefore remand for an award of such fees and costs.

The judgment is affirmed, and the cause is remanded for an award of costs.

BRIGGS, J., specially concurs.

METZGER, J., concurs in part and dissents in part.

Judge BRIGGS specially concurs.

I join in Chief Judge Sternberg's opinion and concur in affirming the judgment.

In regard to Part VI of that opinion, I agree that the trial court properly reconciled §§ 13–21–111.6 and 13–50.5–105, C.R.S. (1987 Repl.Vol. 6A) in refusing to credit the amount of Coppola's settlement with the Simons (homeowners) against the liability of Eaton Corporation (manufacturer) as determined by the jury. This is because the "contract" exception to § 13–21–111.6, the collateral source statute, precludes application of that statute to the Coppola settlement, even if the statute were otherwise applicable. I further agree that only § 13–50.5–105 applies to the Coppola settlement and that, because the jury attributed 0% fault to Coppola, pursuant to § 13–50.5–105 the manufacturer is entitled to no offset because of Coppola's involvement in the case.

I write separately because, in my view, the collateral source statute does not apply to the Coppola settlement agreement, without regard to the statute's "contract" exception. I also write separately to emphasize why the reconciliation of these statutes urged by the manufacturer, in addition to ignoring the historical context of the statutes, would lead to arbitrary and inequitable result and would contravene important public policies.

I.

Section 13–21–111.6, the collateral source statute, provides in relevant part that the court must reduce the verdict by the amount by which the plaintiff has been indemnified or compensated by another "in relation to the injury, damage, or death sustained." The statute itself refers to a reduction for the amount of a payment from another "in relation to" the injury—not from another who otherwise may be "liable in tórt," as provided in 13–50.5–105. This choice of wording does not compel the conclusion that § 13–21–111.6 should apply not only to payments from a collateral source independent of any wrongdoing but also to compensation paid to avoid the risk of being found "liable in tort."

As our supreme court has recognized, because the scope of § 13–21–111.6 is not entirely clear, we must look beyond its language to determine the construction most in accordance with the General Assembly's intent. *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070 (Colo.1986). To reach the conclusion urged by the manufacturer that the statute applies to those who have settled a tort claim but are assigned no fault at trial, we would again have to ignore the statute's historical context.

Section 13–21–111.6 was enacted to restrict the scope of the "collateral source" rule in Colorado. *Van Waters & Rogers, Inc. v. Keelan, supra.* Colorado law had previously provided that compensation or indemnity received by an injured party from a "collateral source," that is, a source "wholly independent of the wrongdoer," and to which the wrongdoer had not contributed, would not diminish the damages otherwise recoverable from the wrongdoer. *Kistler v. Halsey,* 173 Colo. 540, 545, 481 P.2d 722, 724 (1971); *see* 22 Am. Jur.2d *Damages* § 566 (1988).

Benefits from "collateral sources" have historically included payments from insurance policies, employee benefits, gratuities, and social legislation. *See* Restatement (Second) of Torts § 920A comment c (1979). What have *not* been considered payments from a

collateral source are payments made in compensation for the injury in order to avoid exposure to being found liable in tort at trial. *See* Restatement (Second) of Torts § 885 comment f (1979).

Further, understood in its historical context, it is not necessary to apply § 13–21–111.6 to such a settlement merely because the statute was enacted in part to avoid the problem of "double recovery." *See U.S. Fidelity & Guaranty Co. v. Salida Gas Service Co.,* 793 P.2d 602 (Colo.App.1989). The principle of preventing "double recovery" is merely another formulation of the collateral source rule. *See Van Waters & Rogers, Inc. v. Keelan, supra;* Restatement (Second) of Torts § 920A (1979). As the supreme court explained in *Van Waters,* the legislative history indicates § 13–21–111.6 was intended to limit the circumstances in which a plaintiff could recover both from a collateral source and from an alleged tortfeasor for the same benefits, such as costs of hospitalization.

There is no similar "double recovery" in the proper sense of that term when a plaintiff reaches what proves in hindsight to have been an advantageous settlement. It is that very possibility that encourages both injury victims and alleged tortfeasors to settle.

Our supreme court has rejected the notion that because an alleged tortfeasor pays more in settlement than the jury determines was its liability the plaintiff has somehow received an unjust windfall:

> [T]he plaintiff always takes the opposite risk, that the settlement will amount to less than the ultimate jury award. Courts have never attempted to redress the inequities that appear in settlements when viewed with the aid of hindsight; otherwise, settlements would not be final and parties would be reluctant to settle.

*Kussman v. City & County of Denver,* 706 P.2d 776, 778 (1985) (fn. 5).

There is no reason to reach a different result under our system of pro rata liability. *See Schantz v. Richview, Inc.,* 311 N.W.2d 155, 156 (Minn.1981) ("It should be no concern of the nonsettling defendant how much the plaintiff received from the settling defendant.... [A]ll that should concern the non-settling defendant is that he not be required to pay more than his percentage share of the total damages which the jury determines the plaintiff sustained."); *Rogers v. Spady,* 147 N.J.Super. 274, 277, 371 A.2d 285, 287 (App. Div.1977) ("Each tortfeasor is liable for the same percentage of the judgment as the percentage of negligence found attributable to him. A natural corollary to this is that when a claimant settles with a codefendant, that percentage of negligence found attributable to the settling codefendant will be deducted from the verdict returned against the other codefendants found liable.... Other jurisdictions with similar comparative negligence laws are in accord with this proposition."); *see also Brochner v. Western Insurance Co.,* 724 P.2d 1293, 1298–99 (Colo.1986) ("The principle of proportionate fault adopted by the General Assembly represents a rational and equitable approach to the problem of allocating *ultimate responsibility* between or among joint tortfeasors for the payment of damages to an injured party." (emphasis added)).

I therefore agree with the court, for these additional reasons, that § 13–21–111.6 is not applicable to Coppola's settlement with the homeowners.

In regard to § 13–50.5–105, the Chief Judge's opinion properly places this statute in its historical context and construes it, in conformance with recognized tort principles, to apply to payments received from those who pay compensation for the injury to avoid exposure to tort liability at trial. Neither the 1986 amendment to § 13–50.5–105 nor the enactment of § 13–21–111.6 requires any different result. They in fact support our interpretation.

The amendment of § 13–50.5–105 and the enactment of § 13–21–111.6 were part of the tort-reform legislation of 1986. These were two of the various steps taken by the General Assembly to limit damage awards in certain respects. *Van Waters & Rogers, Inc. v. Keelan, supra.*

The amendment of § 13–50.5–105 changed the mechanism of crediting a settlement with an alleged tortfeasor to a remaining defendant. Under the original version of the statute the verdict was reduced by the amount of

the settlement. The amendment changed the method of reduction, which is now based on the percentage of fault attributed at trial to those who have settled.

The amendment of § 13–50.5–105 and the enactment of § 13–21–111.6 were accomplished in conjunction with the enactment of § 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A). That statute provides that no defendant shall be liable for an amount greater than that represented by the degree or percentage of negligence or fault attributable to that defendant.

These provisions accomplish the General Assembly's goal of allocating responsibility for payment of damages on the basis of pro rata liability. *See Brochner v. Western Insurance Co., supra.* At the same time, they allow both the injury victims and the alleged tortfeasors to keep the benefit of any advantageous settlement.

Neither § 13–21–111.6 nor § 13–50.5–105 explicitly provide, and there is no reason to construe either to provide, that a tortfeasor who refuses to settle can choose a credit in the amount of the settlement instead of the percentage of fault assigned at trial. That option was removed with the amendment of § 13–50.5–105 in 1986 when the General Assembly *completely removed* any reference to a deduction for the amount of the settlement. In its place the statute now expressly provides for a reduction *only* of the percentage of fault attributed by the finder of fact to that tortfeasor.

The amendment of § 13–50.5–105 and enactment of § 13–21–111.6 as component parts of the 1986 tort-reform legislation support the court's reconciliation of them in another way. The amendment and the new statute were approved within a week of each other and both bills had the same sponsors. Colo. Sess.Laws 1986, ch. 107 at 679 and ch. 108 at 680; *see generally* Epstein & Edelman, *Set-Off Under the Contribution and Collateral Source Statutes,* 21 Colo.Law. 1421 (July 1992). If the intent had been that a defendant by refusing to settle should benefit by receiving credit for the amount of a settlement with another who at trial was found not at fault or negligent, the General Assembly could have so stated when it amended § 13–50.5–105.

Nor is there any apparent reason why, if the jury assigned 1% fault to a designated nonparty who earlier settled, the General Assembly would have intended § 13–50.5–105 to apply, resulting in a credit to defendant of only that percentage of fault, no matter how large the settlement, but at the same time intended to credit the defendant under § 13–21–111.6 with the entire amount of the settlement if the jury assigned 0% fault. It is even more difficult to understand why it should be assumed that the General Assembly intended that a defendant who refuses to settle can choose the greater reduction which results under the two statutes no matter what percentage of fault the jury assigns to the designated nonparty who settled.

The more reasonable reconciliation of the two statutes, consistent with their historical context and the goals of tort reform, is that only § 13–50.5–105 as amended applies to compensation paid to avoid exposure to liability at trial. Section 13–21–111.6 applies to payments from collateral sources independent of any alleged tort liability. *See Wong v. Sharp,* 734 F.Supp. 943 (D.Colo.1990).

## II.

Aside from logic and history, we must presume that the General Assembly intended a just and reasonable result when enacting these statutes. *See Smith v. Zufelt,* 856 P.2d 8 (Colo.App.1992). The case before us nicely illustrates that the reconciliation of §§ 13–21–111.6 and 13–50.5–105 urged by the manufacturer leads to arbitrary and inequitable results the General Assembly could not have intended.

Here, the jury returned a verdict in favor of the homeowners in the total amount of $875,000. The jury determined that the manufacturer was 75% at fault, the Schnells 25%, and Coppola 0%. The homeowners had earlier received settlements paid on behalf of the Schnells for $100,000 and on behalf of Coppola for $300,000.

Under the manufacturer's interpretation of the two statutes, because 25% of $875,000, or $218,750, is greater than the $100,000 re-

ceived in settlement from the Schnells, the damages to be awarded the plaintiffs would first be reduced by $218,750. Then, because the $300,000 settlement from Coppola is greater than the zero degree of fault assigned at trial, the $300,000 would be deducted. The result is that the manufacturer would be liable to the plaintiffs for a total of $356,250, even though the jury had determined the manufacturer was liable for 75% of $875,000, or $656,250.

In comparison, the homeowners had received in settlements the total amount of $400,000. The jury determined that those who had settled with the homeowners were, in total, 25% at fault, equal to $218,750 in liability. In hindsight, the homeowners received the advantage of the two settlements. Yet under the manufacturer's interpretation of these statutes, the homeowners would receive, in addition to the $400,000 in settlements, only $356,250 from the manufacturer, for a total of $756,250.

The result under the manufacturer's proposed statutory construction would be that: (1) the manufacturer would benefit from refusing to settle, its liability, after being credited with the settlements, $300,000 less than its share of fault or negligence as determined by the jury; (2) the others who were facing exposure to tort liability and were willing to settle would share in none of the benefit taken from the homeowners; and (3) the homeowners, as a result of advantageous settlements and successful litigation, would receive in total less than the full amount of damages determined by the jury.

Other cases would lead to different arbitrary and inequitable results. For example, it is not unusual for the defendant to designate a nonparty the plaintiff did not name as a defendant. The plaintiff may then be forced to add that party as a defendant in order to decrease the risk of receiving less than full compensation for the injuries. The newly named defendant may then at some point settle with the plaintiff to avoid further costs and possible exposure to liability at trial. Under the manufacturer's construction of the statutes, the remaining defendant would be entitled to a credit in the full amount of any settlement if the jury assigns

no fault to the designated nonparty who has settled. Thus, the defendant would have benefited by precipitating additional and unwarranted litigation.

In addition, the defendant who refuses to settle would have achieved this benefit by taking away from the plaintiff the benefit of the settlement bargain. It was precisely this shifting of the advantages and disadvantages of prior settlements that our supreme court rejected in *Kussman v. City & County of Denver, supra.*

These arbitrary and inequitable results are avoided, consistent with the goals of tort reform, by construing only § 13–50.5–105 to apply to compensation paid to avoid exposure to tort liability.

### III.

The final reason, and perhaps most important, for rejecting the reconciliation of §§ 13–21–111.6 and 13–50.5–105 urged by the manufacturer is to avoid violating two public policies of critical importance.

### A.

The "overriding policy" of the Uniform Contribution Among Tortfeasors Act, of which § 13–50.5–105 is a part, is to insure full compensation for the plaintiff's injuries. *Kussman v. City & County of Denver, supra.* Nowhere in the language or legislative history of either § 13–21–111.6 or § 13–50.5–105 is there any intimation that the General Assembly has concluded that Colorado's public policy should be to the contrary.

To be sure, as a result of tort reform, the occasions on which an injury victim may not receive full compensation have increased. But this is a result of the financial circumstances of the tortfeasors, who now are liable only for their pro rata shares of fault. If one cannot pay the assigned pro rata share, no longer is another tortfeasor liable for it. This is far different from assuming the General Assembly intended to create a statutory scheme which deprives injury victims of full compensation, even though all tortfeasors are able to pay their pro rata shares—injury victims who without full compensation might

have to rely upon, and become a drain on, governmental resources.

The supreme court's conclusion under the prior version of § 13–50.5–105, although in a different context, is equally applicable here to the amended statute:

> In light of these considerations, we believe that a refusal to reduce the judgment by the settlement amount is justified under the Act even if it results in overcompensation to the plaintiff, particularly since a contrary rule would defeat, in cases such as the present one, the Act's overriding goal of ensuring full compensation.

*Kussman v. City & County of Denver,* 706 P.2d at 781 (fn. 5).

### B.

Equally if not more important, the public and judicial policies in Colorado favor the settlement of disputes. And, while a complete settlement is always preferable, even partial settlements should be encouraged, for these may be necessary steps leading to a complete settlement. *See Stubbs v. Copper Mountain, Inc.,* 862 P.2d 978 (Colo.App. 1993).

The General Assembly through tort-reform legislation has furthered its goal of providing for equitable sharing of payment for damages, but not without some cost to the goal of encouraging settlement. *See Stubbs v. Copper Mountain, Inc., supra.* That cost is at least minimized, with no impact on the goals of tort reform, by applying only § 13–50.5–105 to payments injury victims receive as compensation for their injuries from those who otherwise would face exposure to tort liability.

In contrast, the result of the manufacturer's reconciliation of these statutes would be significantly to discourage injury victims from discussing settlement with one of several alleged tortfeasors. The injury victim would know that any benefit obtained from making what proves to have been a good settlement could be taken away and bestowed on the tortfeasors who refuse to settle, even to the extent that the injury victim could receive less than full compensation as determined at trial.

However, it is not just the injury victims who would be discouraged from settling:

> [A] contrary result would discourage settlements in another way: the nonsettling tortfeasor would pay less than its proportionate share of damages after the settlement amount is deducted, and tortfeasors would have an incentive not to settle, hoping that intransigence would be rewarded when another tortfeasor settled for an amount in excess of its true liability.

*Kussman v. City & County of Denver,* 706 P.2d at 781 (fn. 5).

The construction urged by the manufacturer would provide unnecessary incentives both to injury victims and alleged tortfeasors not to settle: reason enough to reject such a construction.

### IV.

It is often said that our primary task in construing statutory provisions is to ascertain and give effect to legislative intent. E.g., *Property Tax Administrator v. Production Geophysical Services, Inc.,* 860 P.2d 514 (Colo.1993). Though true, the statement can be misleading: we analyze the statute, not psychoanalyze the General Assembly. *See United States v. Public Utilities,* 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) (Jackson, J., concurring).

It may be more accurate to say we seek a statutory construction consistent with the statute's words, with the public policy we perceive conveyed by those words, and with other applicable public policies. When the words are susceptible of more than one meaning or leave their scope unclear, we derive the public policy being conveyed and its scope in part from the statute's historical context, *see* § 2–4–203, C.R.S. (1980 Repl. Vol. 1B), and in part from the assumption that the General Assembly intended a just and reasonable result consistent with other public policies. *See* §§ 2–4–201, C.R.S. (1980 Repl.Vol. 1B) and 2–4–203.

Our task in this process is complementary of, not contradictory to, that of the General Assembly. Together we attempt to create a coherent and intelligible framework of general law. And, when legislation is enacted not

as part of a comprehensive scheme but rather in isolation, as in the case of the tort reform of 1986, it is even more critical that we formulate synthesizing rules. *See generally* Tate, *The Law–Making Function of the Judge*, 28 La.L.Rev. 211 (1968).

In urging us to adopt its construction of these statutes, the manufacturer relies in part on the rationale in several prior decisions of this court, including *Smith v. Zufelt, supra, Gutierrez v. Bussey*, 837 P.2d 272 (Colo.App.1992), and *U.S. Fidelity & Guaranty Co. v. Salida Gas Service Co., supra.* However, the interpretation the manufacturer would have us adopt ultimately ignores the historical context of §§ 13–21–111.5 and 13–50.5–105, leads to absurd and inequitable results, and violates other applicable public policies of substantial importance.

The holding today avoids these pitfalls, consistent with the goals of tort reform, with a simple but sound statutory interpretation: Section 13–50.5–105 applies to compensation paid to avoid exposure to liability in tort; section 13–21–111.6 applies to payments received from collateral sources unrelated to tort liability.

Judge METZGER concurring in part and dissenting in part.

I respectfully dissent from part VI of the majority opinion holding that the manufacturer is not due a credit for the settlement with Coppola.

I believe that § 13–50.5–105, C.R.S. (1987 Repl.Vol. 6A) is inapplicable to this case. That statute concerns the effect of a release or covenant not to sue upon a judgment involving multiple tortfeasors. It is intended to reduce the aggregate claim against the non-settling tortfeasors to the extent of any degree or percentage of fault or negligence attributable to the settling tortfeasor. Of importance to this case is that the statute expressly provides that it applies only:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons *liable in tort* of the same injury or the same wrongful death.... (emphasis added)

When a jury determines that a person is not negligent or not at fault, that person cannot be considered to be "liable in tort" or to be a tortfeasor within the meaning of § 13–50.5–105. *Wesley v. United Services Automobile Ass'n*, 694 P.2d 855 (Colo.App. 1984).

Even though Coppola entered into the settlement and covenant not to execute, he remained a defendant throughout trial. The jury verdict attributed 0% fault to him. Accordingly, Coppola was not "liable in tort" within the meaning of § 13–50.5–105 and that statute is thus inapplicable.

I would hold, however, that the judgment against the manufacturer must be reduced pursuant to § 13–21–111.6, C.R.S. (1987 Repl.Vol. 6A).

The statute, a codification of the common-law collateral source rule, provides in pertinent part:

In any action by any person ... to recover damages for a tort resulting in ... injury to person or property, the court, after the finder of fact has returned its verdict stating the amount of damages to be awarded, shall reduce the amount of the verdict by the amount by which such person ... has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund in relation the injury ... sustained; except that the verdict shall not be reduced by the amount by which such person ... has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person. The court shall enter judgment on the reduced amount.

The jury awarded $850,000 to Mrs. Simon and $25,000 to Mr. Simon. After reduction to the 75% attributable to the manufacturer, the court entered judgment against the manufacturer for $637,500 and 18,750 plus prejudgment interest.

In my view, the court erred when it did not reduce the amount of the verdict, pursuant to § 13–21–111.6, by the $300,000 received by the Simons in their settlement with Hawkeye Insurance Company on behalf of defendant Coppola and his employees Anderton and Wolf.

Contrary to the homeowners' contention, the settlement does not fall within that statutory exemption because the covenant should not be construed as a contract which the homeowners entered into and for which they gave consideration.

A release or covenant not to execute which accompanies and is executed with a settlement agreement fails to transform the settlement monies into a "benefit paid as a result of a contract entered into and paid for by or on behalf of such person."

I do not read the supreme court's opinion in *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070 (Colo.1992), as expanding the definition of contract so broadly as to include the covenant not to execute here within the statutory exception.

In that case, the court held that the clause in question was:

[B]road enough to cover contracts for which a plaintiff gives some form of consideration, whether it be in the form of money or employment services, with the expectation of receiving future benefits in the event they become payable under the contract.

*Van Waters & Rogers, Inc. v. Keelan, supra,* at 1079.

In my view, in *Van Waters* the supreme court intended to extend the exception only to benefits received through an employment contract, under which the employee gives consideration in the form of services rather than money. *See Combined Communications Corp. v. Public Service Co. of Colorado,* 865 P.2d 893 (Colo.App.1993). That interpretation, while consistent with the purpose of the statute, does not extend to the type of contract at issue here. *See Martinez v. Shapland,* 833 P.2d 837 (Colo.App.1992) (exception does not apply to PIP benefits as they flow from insurance contract).

In *Van Waters,* the supreme court reviewed the legislative history of the statute before it interpreted the clause to include benefits received under an employment contract. It noted a legislative discussion which evidenced an intention that the exception include not only benefits from private insurance contracts for which someone pays monetary premiums but other types of benefits,

such as "individually held disability and life insurance, social security benefits, death benefits and maybe some unemployment benefits." *Van Waters & Rogers, Inc. v. Keelan, supra,* 840 P.2d at 1079.

Given this history, the court determined that, while the general legislative intent was to limit double recoveries, the General Assembly did not seek to "deny a plaintiff compensation to which he is entitled by virtue of a contract that either he, or someone on his behalf, entered into and paid for with the expectation of receiving the consequent benefits at some point in the future." *Van Waters & Rogers, Inc. v. Keelan, supra,* 840 P.2d at 1078. Thus, it held that the benefits received under the plaintiff's employment contract, though not directly paid for by the plaintiff or someone on his behalf, were nevertheless covered under the exemption.

Virtually all settlements are incorporated in or accompanied by some form of contract, be it a release or, as here, a covenant not to enforce judgment. Further, plaintiffs who enter into settlements generally have the anticipation of receiving the benefit of the settlement at the time of its execution, not the expectation of receiving consequent benefits of the contract at sometime in the future. And, while plaintiffs do give consideration in the form of release or abandonment of the right to pursue legal claims, such consideration is not equivalent to services to be performed or moneys to be paid over time where such services or moneys are unrelated to the litigation.

If such were not so, the result would be that the General Assembly has enacted a statute which requires a court to offset the proceeds of a settlement received by the plaintiff and then to allow those same proceeds to be exempted from offset in virtually every case because of the ancillary contract which invariably accompanies such a settlement.

To so construe the statute would lead to the absurd result of the exception swallowing the rule. It must be presumed that the General Assembly did not intend such a result. *City of Ouray v. Olin,* 761 P.2d 784 (Colo.1988).

Accordingly, I would hold that the indemnity or compensation received from proceeds

of a settlement, which includes a contract in the form of a release or covenant not to execute, reached with a defendant *who remains a party* but is found not to be at fault is subject to the provisions of § 13–21–111.6, C.R.S. (1987 Repl.Vol. 6A) and is not exempted by the statutory exception by reason of the accompanying contract.

This conclusion is in accord with cases which have held that settlement proceeds must be deducted from the award when the settling party is. designated as a *nonparty* but found not to be at fault. *See generally Smith v. Zufelt,* 856 P.2d 8 (Colo.App.1992); *Gutierrez v. Bussey,* 837 P.2d 272 (Colo.App. 1992); *United States Fidelity & Guaranty Co. v. Salida Gas Service Co.,* 793 P.2d 602 (Colo.App.1989).

Thus, pursuant to § 13–21–111.6, C.R.S. (1987 Repl.Vol. 6A), the court should have deducted the $300,000 settlement received by the Simons from defendant Coppola's insurance carrier from the verdict and entered judgment on the reduced amount. Accordingly, I would reverse as to this issue and would remand for entry of an appropriate judgment. In all other respects, I concur with the majority opinion.