Charles SMITH and Michael Smith,
Petitioners/Cross–Respondents,

v.

Ronald ZUFELT and Katherine Zufelt, as
parents and next friends of Kory Zufelt,
and Kory Zufelt, Respondents/Cross–Pe-
titioners.

No. 92SC845.

Supreme Court of Colorado,
En Banc.

Sept. 12, 1994.

Rehearing Denied Oct. 11, 1994.

Shand, McLachlan & Newbold, P.C., Michael E. McLachlan, Sheryl Rogers, Durango, for petitioners/cross-respondents.

Crane and Tejada, Alex C. Tejada, Douglas R. Ware, Bethiah Beale Crane, Dawes and Harriss, P.C., Robert C. Dawes, Gail C. Harriss, Durango, for respondents/cross-petitioners.

Fogel, Keating & Wagner, P.C., William L. Keating, Timothy F. Devereux, Denver, for amicus curiae Colo. Trial Lawyers Ass'n.

Montgomery, Green, Jarvis, Kolodny & Markusson, P.C., Dennis H. Markusson, Joyce L. Jenkins, Denver, for amicus curiae Colo. Defense Lawyers Ass'n.

Justice SCOTT delivered the Opinion of the Court.

In this case we are called upon to decide the appropriate amount of settlement proceeds, if any, that should be offset from a jury award when a plaintiff has both settled with a nonparty and successfully litigated claims for the same injury against nonsettling defendants. After a jury verdict for plaintiff, the trial court reduced the jury award by deducting an amount based on the fault attributed to the settling nonparty, which amount was less than the total settlement paid by the nonparty. The court of appeals reversed, holding that because settlement proceeds are payments from a collateral source, the total settlement amount, less that portion representing attorney fees, should be offset from the amount nonsettling defendants are to pay as damages in accordance with the jury verdict. *Smith v. Zufelt*, 856 P.2d 8 (Colo.App.1992).

Both parties petitioned for certiorari, and we granted defendants' petition to address the exclusion of attorney fees from the calculus and plaintiffs' cross-petition to decide the settlement proceeds setoff issue. For the reasons set forth below, we hold that an offset is appropriate but that the amount of offset should be limited by the percentage of liability attributed to the settling nonparties. Because the amount paid in settlement, less attorney fees, exceeds the liability attributed to the nonparty, it is unnecessary for us to reach, and we decline to address, the issue of whether the amounts paid as attorney fees were properly excluded from any offset. We therefore reverse in part, and remand to the court of appeals with directions that the judgment of the trial court be reinstated.

I

In January of 1988, Kory Zufelt ("Kory"), age eight, was accidentally shot in the stomach by Michael Smith, age twelve. The two boys and Kory's brother, Troy Zufelt, were hunting on land owned by Michael Smith's grandparents, Maude and Ellis Smith. Kory, his brother Troy, and his parents, Katherine and Ronald Zufelt, (collectively "the Zufelts") brought a negligence action against Michael Smith, Michael's parents,

Charles and Hazel Smith, and Michael's grandparents, Maude and Ellis Smith.

Prior to trial, Maude Smith and Ellis Smith settled with the Zufelts for $88,629.24.[1] The settlement was apportioned $50,000 to Kory; $7,000 to Troy Zufelt; $2,500 to the Zufelt family; and $29,129.24 for attorneys' fees and costs. For purposes of trial, Maude and Ellis Smith were then designated as "statutory nonparties having fault" pursuant to section 13–21–111.5, 6A C.R.S. (1987 & 1993 Supp.).[2]

The Zufelts tried their case against the remaining defendants, Michael Smith and his parents, Charles and Hazel Smith. The jury found in favor of the Zufelts and returned verdicts in the amount of $105,000 for Kory and $25,000 for Kory's parents. Fault was apportioned as follows: 84% to Charles Smith; 0% to Hazel Smith; 15% to Maude Smith; 0% to Ellis Smith; and 1% to Michael Smith. The trial court then reduced the verdict by an amount equivalent to the 15% fault charged to the settling nonparties, Maude and Ellis Smith. The court therefore entered a judgment ordering the defendants to pay $89,250 to Kory and $21,250 to Kory's parents, Ronald and Katherine. Kory received total compensation of $139,250—$50,000 from the settlement with Maude and Ellis Smith and $89,250 from the judgment at trial.

In *Smith v. Zufelt*, 856 P.2d 8 (Colo.App. 1992), the court of appeals held that the settlement proceeds received by Kory were collateral to the amount to which he was entitled to be made whole and should therefore be offset from the amount which Kory was entitled to receive as determined by that jury verdict. The court reversed that part of the district court's ruling which reduced the jury's award to Kory by 15% (the amount of liability attributed to the settling nonparties, Maude and Ellis Smith), and held that the award should instead be reduced by $50,000, the total amount Kory was paid under the settlement with Maude and Ellis Smith. The court of appeals limited Kory's recovery to a total of $105,000, which represents an amount equivalent to the jury award, less the $50,000 paid in settlement.

The court of appeals' holding represents a reduction of $33,250 from the amount granted by the trial court. The court of appeals held that as a "general rule ... when the settlement amount actually received by the plaintiff exceeds the percentage of fault assigned to the settling nonparty, the total settlement is deducted from the total verdict." *Zufelt*, 856 P.2d at 11.[3]

The court additionally determined that the attorney fees attributable to Kory's proceeds ($24,468.56) paid by Maude and Ellis Smith as part of the settlement agreement should not have been included in the offset. The court reasoned that "those proceeds were not actually collected by plaintiffs for their losses and therefore, do not constitute indemnification or compensation for the loss of the in-

1. Because Ellis Smith died prior to settlement, the settlement was actually reached with Maude Smith and the estate of Ellis Smith. For purposes of simplicity, however, we will refer to Maude Smith and the estate of Ellis Smith simply as Maude and Ellis Smith.

2. Section 13–21–111.5 provides in pertinent part as follows:

 **Civil liability cases—pro rata liability of defendants.** (1) In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant....

 ....

 (3)(a) Any provision of the law to the contrary notwithstanding, the finder of fact in a civil action *may consider the degree or percentage of negligence or fault of a person not a party to the*

 *action*, based upon evidence thereof, which shall be admissible, in determining the degree or percentage of negligence or fault of those persons who are parties to such action.

 ....

 (b) *Negligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty* or if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action unless the court determines that a longer period is necessary.
 (Emphasis added.)

3. Because the amount paid in settlement to Kory's parents by the settling nonparties was less than the amount equivalent to their percentage of liability, the court of appeals did not alter the award to Kory's parents.

jured party, as contemplated in § 13–21–111.6." *Zufelt*, 856 P.2d at 11.

We granted certiorari to determine whether the jury award to Kory should be reduced by the full amount paid to Kory by the settling nonparties or by a lesser amount based on the apportioned liability of the settling nonparties as established at trial. We also granted certiorari to decide whether attorney fees and costs should be included in the amount to be offset from the jury award.[4] We conclude that the jury award should have been reduced only by the amount equivalent to the percentage of liability attributed to the settling nonparties. Our resolution of this issue under the facts of this case makes it unnecessary to address the issue regarding attorney fees · setoff.

## II ·

We begin our analysis with a look at the relevant statutes and a review of the prior cases which have addressed the apparent conflict between these statutes.

## A

In 1977, Colorado adopted the Uniform Contribution Among Tortfeasors Act (the "Contribution Act"), §§ 13–50.5–101 to 50.5–106. *See* Ch. 195, sec. 1, §§ 13–50.5–101 to 50.5–106, 1977 Colo.Sess.Laws 808–810. The Contribution Act provided that a good faith release or covenant not to sue given to one tortfeasor served to reduce the claim against any other tortfeasors "to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for, whichever is the greater." § 13–50.5–105, C.R.S. (1977). The Contribution Act thus required that the verdict rendered against the nonsettling party be reduced by the amount paid in settlement by the joint tortfeasor. The Contribution Act also pro-

vided that each defendant to whom some negligence was attributable was jointly and severally liable for the entire amount of the judgment.

In 1986, however, the General Assembly amended section 13–50.5–105 (the "percentage statute") to conform with the abrogation of joint and several liability.[5] The percentage statute was amended to its present form which provides that the good faith release of one tortfeasor

> does not discharge any of the other tortfeasors from liability for their several pro rata shares of liability for the injury, death, damage, or loss unless its terms so provide; *but it reduces the aggregate claim against the others to the extent of any degree or percentage of fault or negligence attributable by the finder of fact ... to the tortfeasor to whom the release or covenant not to sue is given.*

§ 13–50.5–105, 6A C.R.S. (1987) (emphasis added). As with the prior version of section 13–50.5–105, the statute further states that such a release or covenant not to sue "discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor."

In 1986, section 13–21–111.6 was enacted (the "amount statute"), and provides as follows:

> In any action ... to recover damages for a tort ... the court, after the finder of fact has returned its verdict stating the amount of damages to be awarded, *shall reduce the amount of the verdict by the amount by which such person ... has been or will be wholly or partially indemnified or compensated for his loss* by any other person, corporation, insurance company, or fund in relation to the injury....

§ 13–21–111.6, 6A C.R.S. (1987) (emphasis added).

---

**4.** Our order granting certiorari set forth the issues as follows:

(1) Whether the court of appeals erred in holding that the jury verdict should be reduced by the amount of the settlement sum paid jointly by nonparties Maude and Ellis Smith to Kory Zufelt.

(2) Whether the court of appeals erred when it excluded attorney fees and costs from the gross settlement amount for which the plaintiffs had

been compensated for their loss as defined by § 13–21–111.6, 6A C.R.S. (1987).

**5.** With a few limited exceptions, *see* § 13–21–111.5(4), the legislature abandoned the concept of joint and several liability by enacting § 13–21–111.5, 6A C.R.S. (1987), which provides that no defendant shall be liable for more than his *pro rata* share of fault, and allows the jury to apportion fault to a settling nonparty. *See* n. 2 *supra*.

The apparent conflict between these two statutes can best be illustrated by reference to the specific facts and holdings of the instant case. Here, the trial court applied the percentage statute and therefore reduced the jury award to Kory Zufelt by 15%, the amount of liability attributed to the settling nonparties. Because the jury award to Kory was $105,000, the 15% reduction by the trial court resulted in an award of $89,250. Including the settlement proceeds paid to benefit Kory, $50,000 per the "structured settlement," his total recovery under the percentage statute was $139,250.[6] The court of appeals, however, held that the amount statute takes precedence whenever the settlement proceeds exceed the amount equivalent to the percentage of liability attributed to the settling parties. The court of appeals thus reduced the trial award ($105,000) by the full amount of the settlement, $50,000, excluding attorney fees. Therefore, under the court of appeals' judgment, Kory received $55,000, which was less than the original trial court award of $89,250.

**B**

Prior to deciding the instant case, the court of appeals reviewed its earlier decisions in which it addressed the apparent conflict between the percentage statute and the amount statute. Our examination of these same cases reveals that, like the instant case, each applies the statute to prohibit plaintiffs from receiving a total award in excess of the damages found by the jury at trial. *See Gutierrez v. Bussey,* 837 P.2d 272 (Colo.App. 1992) (holding that the amount statute should apply where no percentage of liability was attributed to the settling nonparty); *Herrera v. Gene's Towing,* 827 P.2d 619 (Colo.App. 1992) (applying the percentage statute where

a settling nonparty was found to be 45% liable and the settlement proceeds were "substantially less" than the percentage of total damages charged to the settling party by the jury); *U.S. Fidelity v. Salida Gas,* 793 P.2d 602 (Colo.App.1989) (applying the amount statute where the settling nonparty was found 0% liable because the amount statute was enacted last in time and the legislative history indicates that the statute was enacted in order to prevent double recovery by plaintiffs).

In its most recent decision on this matter, however, the court of appeals took a different approach. In *Simon v. Coppola,* 876 P.2d 10, (Colo.App.1993), *cert. granted,* June 27, 1994, the court utilized the "contract exception"[7] to the amount statute as a means to reconcile these two statutes. The *Simon* court examined our interpretation of the contract exception in *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070 (Colo.1992), and determined that a settlement accompanied by a release or covenant not to execute falls within the scope of the contract exception. *Simon,* 876 P.2d at 18. The court concluded that the amount statute is inapplicable to settlement agreements, and allowed the plaintiff to recover an amount in excess of the trial award. *Id.*

The contract exception to the amount statute was also utilized by the federal district court in *Orr v. Koch Supplies,* No. 90–F–1190, slip op. (D.Colo.1991) (order on post-trial motions). In an order denying defendants' post-trial motion for a reduction of the jury award, the court held that payment of cash compensation to the plaintiff in exchange for the release of his claims created a legally enforceable contract falling within the contract exception to the amount statute.

---

**6.** In addition to the settlement proceeds paid for the benefit of Kory, the settling nonparties were required to pay plaintiffs' attorney fees and costs in the aggregate amount for all plaintiffs of $29,-129.24. The attorneys' fees were not split between Kory, his brother, and his parents; however, based on the apportioned damages, Kory's pro rata share was approximately $25,000.

**7.** The amount statute provides that a trial award shall be reduced by the amount which the plain-

tiff has been or will be wholly or partially indemnified or compensated by another in relation to the injury, except that

the verdict shall not be reduced by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person. § 13–21–111.6, 6A C.R.S. (1987).

*Orr*, slip op. at 14–15.[8]

## III

We agree with the results reached in *Wong, Orr,* and *Simon,* that the percentage statute alone applies to settlement agreements entered into to avoid exposure to liability at trial. We reach this conclusion without reliance on the contract exception of the amount statute, but through application of familiar rules of statutory interpretation and an examination of policy implications.

### A

A court's primary purpose in construing a statute is to ascertain and give effect to the intent of the General Assembly. *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1076 (Colo.1992); *Woodsmall and Bennett v. RTD,* 800 P.2d 63, 67 (Colo.1990). In an effort to effectuate the legislative intent, we first look to the statutory language and give words and phrases their plain and ordinary meaning. *Climax Molybdenum v. Walter,* 812 P.2d 1168, 1173 (Colo.1991). Where a statute is unclear, however, and the language lends itself to alternative constructions, it is appropriate to look to the pertinent legislative history in determining which construction is in accordance with the objective sought by the legislature. *General Electric Co. v. Niemet,* 866 P.2d 1361, 1364 (Colo. 1994). If two statutory provisions appear to be in conflict, the reviewing court must attempt to construe the statutes in a manner that will avoid the conflict. *People v. James,* 178 Colo. 401, 497 P.2d 1256 (1972); *see also Cooley v. Big Horn Harvestore,* 813 P.2d 736 (Colo.1991) (noting that if possible, courts must seek to harmonize apparently contrasting statutory provisions). If contrasting statutes cannot be reconciled, the more specific provision prevails over the general provision, unless the general provision was adopted later and the manifest intent is that the general provision prevail. § 2–4–205, 1B

C.R.S. (1973); *Climax Molybdenum Co.,* 812 P.2d at 1174.

Without question, the percentage statute more specifically addresses the issue in the instant case. The amount statute states that a trial verdict shall be reduced by "the amount by which such person ... has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund *in relation to the injury, damage, or death sustained.*" § 13–21–111.6 (emphasis added). This language speaks only of indemnification or compensation made "in relation to the injury." The amount statute does not mention payments made to avoid liability at trial. We are not persuaded, therefore, that the General Assembly intended that the amount statute apply not only to payments from a collateral source independent of any wrongdoing, but also to compensation paid to avoid the risk of being held liable in tort.

In contrast, the percentage statute specifically deals with the question of offsetting settlement proceeds. Entitled "Release or covenant not to sue," it refers to releases given to those "liable in tort," and outlines the procedure for reducing verdicts in those instances where a settlement is reached between a plaintiff and fewer than all tortfeasors, and the settling tortfeasor becomes a "nonparty" by operation of section 13–21–111.5. The statute provides as follows:

**Release or covenant not to sue.** (1) When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons *liable in tort* for the same injury or the same wrongful death:

(a) It does not discharge any of the other tortfeasors from liability for their several pro rata shares of liability for the injury, death, damage, or loss unless its terms so provide; *but it reduces the aggregate claim against the others to the extent of any degree or percentage of fault or negli-*

8. In *Orr,* the court stated that it agreed with its prior analysis in *Wong v. Sharp,* 734 F.Supp. 943 (D.Colo.1990). *Orr,* No. 90–F–1190, slip op. at 14. *Wong* indicated that the Contribution Act alone applied to settlement agreements; however, unlike *Orr,* it made no mention of the contract

exception of the amount statute. Instead, *Wong* relied on the "plain language of the [percentage statute]" and on the fact that the cases cited by the petitioner applied the pre–1986 version of the percentage statute. *Wong,* 734 F.Supp. at 945.

*gence attributable by the finder of fact, pursuant to section 13–21–111(2) or (3) or section 13–21–111.5, to the tortfeasor to whom the release or covenant not to sue is given.*

§ 13–50.5–105, 6A C.R.S. (1987) (emphasis added). Because the percentage statute is specific and the amount statute is general, we are not persuaded that the General Assembly meant for the amount statute to apply to compensation paid to avoid the risk of being held liable in tort.[9]

**B**

Nor does the context in which the amount statute was enacted persuade us that it was intended to apply to settlement proceeds. *See* § 2–4–203(b) (stating that the "circumstances under which the statute was enacted" may be considered in an effort to determine the intent of the General Assembly). We previously examined the history of the statute in *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1077 (Colo.1992), and determined that it was enacted to limit the common law "collateral source rule," which allowed a plaintiff to receive benefits from two different sources for the same injury, provided the "collateral source" was "wholly independent of the wrongdoer." *Id.* at 1074 (quoting *Kistler v. Halsey,* 173 Colo. 540, 545, 481 P.2d 722, 724 (1971)).[10] For example, the collateral source rule prohibited the offset of proceeds from privately purchased insurance policies, sick leave or vacation time given as the result of an accident, benefits from a pension plan to which the plaintiff contributed by way of salary reductions, and disability

benefits provided under an unemployment insurance act. *Van Waters,* 840 P.2d at 1075; *see also Restatement (Second) of Torts* § 920A cmt. c (1979) (noting that benefits from collateral sources have traditionally included payments from insurance policies, employee benefits, gratuities, and social legislation).

Sums paid to avoid liability at trial, however, were not included among the traditional collateral sources with which the amount statute was concerned. *Simon v. Coppola,* 876 P.2d 10, 20–21 (Colo.App.1993) (Briggs, J., specially concurring) (citing *Restatement (Second) of Torts* § 885 cmt. f). We thus agree with the special concurrence in *Simon,* that "the collateral source rule was intended to limit the circumstances in which a plaintiff could recover both from a collateral source and from an alleged tortfeasor for the same benefits, such as costs of hospitalization." *Simon,* 876 P.2d at 21. As noted by Judge Briggs, that is not the concern at issue here: "There is no similar 'double recovery' in the proper sense of that term when a plaintiff reaches what proves in hindsight to have been an advantageous settlement. It is that very possibility that encourages both injury victims and alleged tortfeasors to settle." *Id.*

Also instructive as to the legislative intent behind the amount statute is our decision in *General Electric Co. v. Niemet,* 866 P.2d 1361 (Colo.1994). In *Niemet,* we faced the question of whether the statutory cap on noneconomic damages pursuant to section 13–21–102.5, 6A C.R.S. (1987 & 1993 Supp.)

**9.** In light of this language, we give no credence to the "last-in-time" approach utilized by the court of appeals in *U.S. Fidelity v. Salida Gas,* 793 P.2d 602, 604 (Colo.App.1989) (finding that the amount statute controlled due to its later enactment date). Both the amount statute and the percentage statute became effective on July 1, 1987. Although the amount statute was enacted one week after the percentage statute, we find this distinction too insignificant to apply the "last-in-time" rule. We agree with the federal district court in *Orr v. Koch Supplies,* No. 90–F–1190 (D.Colo.1991) (order denying post-trial motion for reduction of verdict), that the "amendment of § 13–50.5–105 within days of the enactment of § 13–21–111.6 renders application of the last-in-time rule of statutory construction inappropriate." Furthermore, the "last-in-time" ap-

proach is inapposite where one statute more specifically addresses the situation at issue. *See People v. Burke,* 185 Colo. 19, 22, 521 P.2d 783, 785 (1974) ("Before general legislation is deemed to repeal an existing provision of a statute that is specific in its terms, the intent to do so must be clear and unmistakable.").

**10.** The purpose of the common law collateral source rule was to prevent a defendant from receiving credit for compensation from another source and thereby reduce the amount payable as damages to the injured party. To the extent that either party received a windfall, it was considered more just that the benefit be realized by the plaintiff in the form of double recovery rather than by the tortfeasor in the form of reduced liability. *Van Waters,* 840 P.2d at 1074.

applied to the plaintiff's total recovery or to each defendant individually.[11] We found that the cap "applies to the liability share of each defendant in a case, and does not act as a cap on the total amount a plaintiff may recover from several defendants." Two obvious consequences of this decision are that defendants cannot benefit by the fact that a plaintiff reaches a settlement in excess of the cap with another defendant, and a single plaintiff can recover from two or more tortfeasors, in the aggregate, an amount in excess of the statutory cap. Nevertheless, we determined that our holding would not defeat the legislative intent behind the tort reform statutes enacted in 1986, including the amount statute. We found that the "primary goal" of tort reform was "to increase the affordability and availability of insurance by making the risk of insured entities more predictable." *Id.* at 1364.

> If an insurance company can predict risks with reasonable accuracy, then it can also predict its losses and profits. The concern of an insurance company is the risk associated with insuring each individual insured, *not with denying an injured person damages that may be paid by another insurance company or person.*

*Id.* at 1365 (emphasis added).

■ We note additionally that application of the amount statute to the calculation of settlement proceeds would effectively reinstate the *pro tanto* reduction that was specifically abrogated in the 1986 amendment to the percentage statute. Prior to 1986, the percentage statute provided that an award rendered against a nonsettling party be reduced by the amount paid in settlement by the joint tortfeasor. *See* Ch. 108, sec. 3, § 13–50.5–105, 1986 Colo.Sess.Laws 680, 681; *Brochner v. Western Ins. Co.*, 724 P.2d 1293, 1299 (Colo.1986). That offset provision was replaced by the current language which requires that the verdict be reduced by the degree or percentage of fault attributed to the settling party by the jury. Given the similarities between the two bills that introduced the statutes at issue, i.e., common sponsors, consideration by the same committees, the same effective date, *see* Ch. 107, sec. 3, § 13–21–111.6, 1986 Colo.Sess.Laws 677, 679, and Ch. 108, sec. 3, § 13–50.5–105, 1986 Colo.Sess.Laws 680, 681, it is highly implausible that the General Assembly meant to negate the effect of its amendment to the percentage statute just seven days later by the passage of the amount statute. *See Ingram v. Cooper*, 698 P.2d 1314, 1315 (Colo. 1985) ("There is a presumption that the General Assembly intends a just and reasonable result when it enacts a statute, and a statutory construction that defeats the legislative intent or leads to an absurd result will not be followed.").

Finally, the Senate Business Affairs and Labor Committee hearings did not address the potential application of the amount statute to the calculation of settlement proceeds, or the relationship between the amount statute and the percentage statute enacted one week earlier. This conspicuous omission leads us to believe that the General Assembly never contemplated application of the amount statute to settlement payments.

### C

■ Several policy considerations support our holding. In determining legislative intent, "it is presumed that a just and reasonable result is intended, and that the public interest is favored over any private interest; and, in making that determination, we may consider, among other things, the consequences of a particular construction." *Conrad v. City of Thornton*, 36 Colo.App. 22, 27, 536 P.2d 855 (1975) *rev'd on other grounds*, 191 Colo. 444, 553 P.2d 822 (1976); *see also* § 2–4–203(1)(e), 1B C.R.S. (1980).

■ When considering alternative consequences, we will defer to results that encourage the settlement of disputes. *Accord Colorado Insurance Guaranty Ass'n v. Harris*, 827 P.2d 1139, 1142 (Colo.1992) (finding that public policy favors the settlement of disputes); *Davis v. Flatiron Materials Co.*, 182

---

**11.** For example, where a plaintiff is awarded $300,000, and each defendant is determined to be 33% at fault, the question arises whether the $250,000 cap limits the total award to that sum, thereby reducing each defendant's liability by over $16,000, or whether the cap only applies when a defendant individually is held to be responsible for an amount in excess of the cap.

Colo. 65, 511 P.2d 28 (1973) (same). Unlike the ruling of the court of appeals, we adopt the rule that encourages settlement. Under the court of appeals' interpretation of the statutes in question, precedence is given to the amount statute. Thus, there is little incentive for other tortfeasors to settle after one tortfeasor has settled. At that point, a nonsettling defendant has nothing to lose by proceeding to trial. If the settlement is in excess of the harm attributable to the settling nonparties and proves favorable to the plaintiff, the nonsettling defendants receive a windfall.[12] If the settlement turns out to be unfavorable for the plaintiff, the nonsettling defendants pay only their proportionate share of the damages. *See Kussman v. City and County of Denver*, 706 P.2d 776 (Colo. 1986) (examining the *pro tanto* offset required by the pre–1986 version of the percentage statute and finding that "tortfeasors would have an incentive not to settle, hoping that intransigence would be rewarded when another tortfeasor settled for an amount in excess of its true liability").

 For these same reasons, the injured party would also be hesitant to enter into a settlement agreement with one of several tortfeasors. The injured party would undoubtedly realize that any benefit received from an advantageous settlement would end up in the possession of the tortfeasors who refuse to settle, while the burden of a bad settlement would be borne by the injured party. And, although the law favors full settlement over partial settlement, "even partial settlement should be encouraged, for these may be necessary steps leading to a complete settlement." *Simon*, 876 P.2d at 24 (Briggs, J., specially concurring).

The result reached today represents a fundamentally fair resolution of this matter. We essentially decide whether the injured party should receive the benefit of its bargain or whether the nonsettling tortfeasors should benefit. Clearly, the equitable result is that the injured party should benefit. We reach this conclusion not out of sympathy for the victim or malevolence towards the defendant, but because equity dictates that the party which must bear the risk of a bad bargain should also garner the benefit when the bargain later proves to be advantageous. The holding of the court of appeals puts plaintiffs in the position of bearing the entire risk of a bad settlement, while at the same time preventing them from receiving the benefit of a good settlement.

Our reasoning in *Kussman v. City and County of Denver*, 706 P.2d 776, is helpful here. There, we examined the percentage statute prior to its 1986 amendment with reference to the question of whether a tortfeasor found liable for less than the full amount of a plaintiff's damages is entitled to have deducted from its liability the amount paid in settlement to the plaintiff by another tortfeasor responsible for the same injury. We held that such a reduction would neither be equitable nor in accord with sound public policy. We recognized that our holding would permit a plaintiff to recover an amount greater than the total damages assessed by the jury, but held that there should be no reduction of the judgment even in that situation. *Id.* at 781 n. 5. We reasoned as follows:

> As borne out in this case, the plaintiff always takes the opposite risk, that the settlement will amount to less than the ultimate jury award. Courts have never attempted to redress the inequities that appear in settlements when viewed with the aid of hindsight; otherwise, settlements would not be final and parties would be reluctant to settle.

*Id.*

Indeed, we need look no further than the instant case to illustrate the risk which a plaintiff takes in entering into a settlement agreement. Prior to trial, Maude and Ellis Smith jointly settled with Kory's parents for $2,500. The jury subsequently returned a verdict in the amount of $25,000 for Kory's parents, apportioning 15% fault to Maude Smith and the estate of Ellis Smith. Applying the percentage statute, the $25,000 jury

---

**12.** A windfall results for the nonsettling defendants when, due to the inherent damage cap limitation of the amount statute, a settlement paid in excess of the harm attributable to the settling nonparties offsets and reduces the total amount otherwise owing by the nonsettling defendants.

award was then reduced by the 15% fault attributed to Maude and Ellis Smith, thereby decreasing Kory's parents' award by $3,750, a sum larger than the amount they were entitled to under the terms of the settlement. Thus, Kory's parents were awarded $1,250 *less* due to their settlement agreement with Maude and Ellis Smith.[13]

The amount of money collected by an injured party from a settling defendant should not be of any concern to nonsettling defendants. The only concern of the nonsettling defendants should be whether they are required to pay more than their proportionate share of the total damages as determined by the jury.

Recently, the United States Supreme Court adopted similar logic in *McDermott, Inc. v. AmClyde*, —— U.S. ——, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994), in unanimously concluding that the liability of nonsettling defendants should be calculated with reference to the jury's allocation of proportionate responsibility, rather than the dollar amount of the settlement.[14] Of particular significance, the Court flatly rejected the Fifth Circuit's emphasis on the fact that the proportional method might allow overcompensation to a plaintiff:

> The law contains no rigid rule against overcompensation. Several doctrines such as the collateral benefits rule, recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation.

. . . .

> It seems to us that a plaintiff's good fortune in striking a favorable bargain with one defendant gives other defendants no claim to pay less than their proportionate share of the total loss. In fact, one of the virtues of the proportionate share rule is that, unlike the pro tanto rule, it does not make a litigating defendant's liability dependent on the amount of a settlement negotiated by others without regard to its interests.

*Id.* —— U.S. at ——, 114 S.Ct. at 1465; *see also, Shantz v. Richview, Inc.*, 311 N.W.2d 155, 156 (Minn.1981) ("It should be no concern of the nonsettling defendant how much the plaintiff received from the settling defendant.... [A]ll that should concern the nonsettling defendant is that he not be required to pay more than his percentage share of the total damages....").

Finally, our decision today is supported by the simplicity of applying the percentage statute. Only two pieces of information are required to apply the percentage statute: the cumulative percentage of liability attributable to any settling nonparties and the total trial award for the plaintiff. The terms of the settlement agreement should be of no consequence. There is no need for the court to determine whether the settlement amount was paid in a structured form, whether it exceeded the settling nonparty's proportionate share of damages, or whether the settle-

13. Of course, the loss taken by a settling plaintiff often turns out to be much more severe than that of the Zufelts. For example, in *Simon*, the injured homeowners settled against one tortfeasor for $100,000 and it was determined at trial that the settling nonparty was 25% liable for the jury's award of $875,000. Applying the percentage statute, the court of appeals thus reduced the trial award by the amount equal to the percentage of liability attributed to the settling nonparty, 25% of $875,000, or $218,750. *Simon*, 876 P.2d at 18. Thus, by entering the settlement agreement plaintiffs lost $118,750.

14. In *McDermott*, a crane accident causing significant property damage resulted in McDermott, Inc., bringing suit against the manufacturer of the crane, AmClyde, the supplier of the crane's "hook," River Don Castings, and against three different companies that supplied the supporting steel slings for the crane (the "sling defendants"). Prior to trial the sling defendants settled with

McDermott, Inc., for $1 million. The case proceeded to trial and the jury assessed the loss at $2.1 million, allocating 32% of the damages to AmClyde, 38% to River Don Castings, and 30% jointly to McDermott, Inc., and the sling defendants. The trial court held that the jury award should be reduced with reference to the jury's allocation of proportionate responsibility to the settling defendant. The Fifth Circuit Court of Appeals overturned this decision, finding that the award should be determined by giving the nonsettling defendants a credit for the dollar amount of the settlement. The Supreme Court held that the trial court's proportionate share approach was correct. In reaching this decision, the Court analyzed the advantages and disadvantages of the two approaches, and determined that the proportional method is superior because it produces fairer results. *Id.* —— U.S. at ——, 114 S.Ct. at 1464.

ment was paid jointly or received jointly.[15] Nor are additional complexities created where settlement is reached with several different nonparties. *See Partial Settlements in Multiparty Tort Actions: The Latest Chapter,* Colo.Law. Vol. 22, No. 12, 2529, 2531 (Dec.1993).[16]

## IV

 With reliance on settled principles of statutory construction, we conclude that in all instances in which a settlement agreement is reached with one or more parties in order to avoid exposure to liability at trial, and trial is subsequently held against non-settling defendants, the trial verdict shall be reduced by an amount equal to the cumulative percentage of fault attributed to the settling nonparties. The amount to be reduced from the trial verdict shall be calculated in the manner utilized by the trial court in the instant case, i.e., by multiplying the total percentage of liability attributed to the settling nonparties by the total trial verdict awarded the plaintiff. Therefore, in those instances in which the settling nonparties are not determined to be at fault, the plaintiff's trial award will not be reduced. Under the circumstances in this case, because the amount of damages attributable to the settling nonparties is less than the full amount paid in settlement, not including attorney fees, it is therefore unnecessary for us to determine whether the trial court erred by excluding payments of attorney fees from collateral source payments.

15. A problem is also created by joint settlements because the court must determine how to apportion the joint payment between the settling nonparty defendants. Here, for example, the settling nonparties Maude and Ellis Smith paid jointly, yet only Maude Smith was assessed a percentage of negligence at trial. The court of appeals' opinion requires that we compare the amount paid by the settling defendant against the percentage of negligence charged to that specific defendant. Under the current facts, that is a difficult determination to make because we do not· know how much the defendant who was determined to be partly liable paid since it was a joint settlement.

16. The authors put forth a scenario in which one party settles for $10,000 and another party settles for $40,000. If the fault is considered collectively, as in the instant case, and the parties are

We therefore reverse in part, the judgment of the court of appeals and direct that court to vacate its order reducing the trial verdict in favor of Kory Zufelt by the $50,000 settlement with Maude and Ellis Smith, and enter an order directing the trial court to reinstate its judgment reducing the jury award of $105,000 by an amount equivalent to the percentage of fault (15% or $15,750) attributed to the settling nonparties.

assessed 15% and 0% fault respectively with a total verdict for $105,000, the verdict would be reduced by $50,000. If considered separately, however, the gross verdict would be reduced by 15% or $15,750 on account of the first settling party (percentage negligence larger than settlement amount), and $40,000 for the second settling party (settlement amount larger than percentage negligence). The verdict would thus be reduced by $55,750, not $50,000. *See Partial Settlements in Multiparty Tort Actions: The Latest Chapter,* Colo. Lawyer Vol. 22, No. 12, 2529, 2531 (Dec. 1993). Thus, the court's decision whether to treat the settling parties cumulatively or separately can have significant impact on the ultimate award.

Here, the court of appeals held simply that "[u]nder the record presented to us, we choose not to treat the settling parties separately." *Zufelt,* 856 P.2d at 10.