Dianne R. WINKLER, Plaintiff–Appellee,

v.

ROCKY MOUNTAIN CONFERENCE OF the UNITED METHODIST CHURCH, a Colorado non-profit corporation, and Glenn Chambers, Defendants–Appellants.

Colorado Court of Appeals,
Div. V.

Nos. 94CA0652, 94CA0661.

Nov. 9, 1995.

As Modified on Denial of Rehearing
Jan. 18, 1996.

Certiorari Denied Sept. 3, 1996.

Holland, Seelen & Pagliuca, Brian K. Holland, Joyce A. Seelen, Denver, for Plaintiff–Appellee.

Quigley & Bruce, Neil Quigley, Bruce A. Logan, Denver, for Defendant–Appellant Rocky Mountain Conference of the United Methodist Church.

Keller, Wahlberg & Morrato, P.C., James J. Morrato, Denver, for Defendant–Appellant Glenn Chambers.

Opinion by Judge ROY.

In this consolidated appeal, defendants, Glenn Chambers and Rocky Mountain Conference of the United Methodist Church (Conference), appeal from the judgment entered on jury verdicts in favor of plaintiff, Dianne R. Winkler, based on claims that Chambers and the Conference breached their fiduciary duty to Winkler, that the Conference negligently hired or supervised Chambers, and that Chambers engaged in extreme and outrageous conduct. The Conference also appeals the trial court's awards of costs to Winkler. We affirm in part and reverse in part.

Chambers served as senior pastor to Grace United Methodist Church by appointment from the Conference from 1979 until he was suspended in April 1992 because of allegations of misconduct. Throughout his employment, Chambers had an alcohol problem dating to 1972 of which the Conference was aware well prior to 1992.

In 1980, the Conference was informed of an incident concerning Chambers attributable to the abuse of alcohol. In 1986, a woman associate pastor of Grace Church told a District Superintendent for the Conference that Chambers had inappropriately touched her, but requested no further action as she "would take care of it." In October 1991, a parishioner reported to a Conference pastor alleging inappropriate conduct by Chambers, but did not file a formal complaint. At trial, this parishioner testified that she told the Conference that she did not like the way Chambers spoke to her and the fact that "he always seemed to be around" her when she was at church.

Winkler joined Grace Church in 1988 and thereafter began to volunteer her services for a variety of activities including the remodeling of a classroom. Winkler engaged in the volunteer activities, in part, on the recommendation of her therapist to work in a "safe" environment to overcome her fears of the workplace. Winkler's volunteer work caused her to be in contact with Chambers during the off hours. It was this contact with Chambers that led to her lawsuit.

While Winkler testified as to other incidents of improper conduct by Chambers, three incidents set forth the context upon which her claims were based:

(1) Winkler testified that, in August 1990, as she was remodeling a classroom, Chambers approached her, and after some initial conversation he put his arm around her, caressed her back, and told her: "You are really beautiful." He then started stroking her hair and said, "I love you, Dianne; you mean so much to me." After he left, Winkler stated that she felt physically ill, held herself tightly, and cried.

(2) A few days following the first incident, Winkler went to discuss a matter with Chambers in his office. They sat next to each other on a small couch, and he stroked her leg on the inside of her thigh and expressed his love for her. Winkler stated that she tried to ignore his touch and left the room as soon as he answered her question.

(3) In January 1992, Winkler was in a storeroom when Chambers entered the room. He came up to her, put his hand on the left side of her body, and rubbed his body up and down on her right side. He also bumped her and moved his hands up to the side of her breast and told her he "really loved her" and "did she hear what he was saying." Shortly thereafter, when she left the storeroom and told two women she met that she was "sick of" Chambers touching her, one responded, "Oh my God, not you too."

In March 1992, a formal inquiry into Chambers' inappropriate conduct with women began when another woman parishioner filed a formal complaint with church authorities. In partial response to this formal complaint, a Conference pastor held a meeting on April 24, 1992, at her home. This Conference pastor was the same individual who had received the 1991 report. Just prior to the meeting, the Conference suspended Chambers for three months.

Six women, including Winkler, attended the meeting. Winkler testified that the other women described instances of unwanted verbal comments and physical contact. Winkler further stated that all of the women were asked to file written complaints detailing their experiences with Chambers.

Winkler filed suit against Chambers, Grace Church, and the Conference on January 22, 1993, alleging breach of fiduciary duty and outrageous conduct against Chambers; breach of fiduciary duty, negligent hiring or supervision, and outrageous conduct against both Grace Church and the Conference; and vicarious liability by ratification against Grace Church. Winkler also sought punitive damages against all three defendants.

Chambers admitted that he had a long-term problem with alcohol. He stated that he did not remember most of the incidents about which Winkler and the others testified and that it was his general demeanor to be open and affectionate with members of the congregation both verbally and physically. As to those incidents he did remember, he stated that any verbal comments were misunderstood and that the physical contact was incidental.

Prior to trial, Grace Church settled all claims with Winkler for $23,500, and it was

dismissed from the proceedings pursuant to stipulation.

After a twelve-day trial, the jury returned special verdicts in favor of Winkler against Chambers on the breach of fiduciary duty claim totaling $28,675, and on the outrageous conduct claim in the amount of $28,675. The jury also returned special verdicts in favor of Winkler and against the Conference on the claim for negligent hiring and supervision totaling $95,853, and on the breach of fiduciary duty claim in the amount of $10,651. The trial court awarded costs of $2,918.58 against the Conference based on an offer of settlement [judgment] made pursuant to § 13–17–202, C.R.S. (1995 Cum.Supp.), and awarded costs of $13,067.96 against both Chambers and the Conference jointly and severally pursuant to § 13–16–104, C.R.S. (1987 Repl.Vol. 6A).

### I.

■ Initially, we address and reject the Conference's contention that the Establishment Clause of the First Amendment bars Winkler's claims against it.

The Conference contends that the "Book of Discipline," which governs the manner of ordaining ministers, their election to membership in the Conference, the responsibilities of membership in the Conference, and the manner of discipline and removal, embodies religious beliefs that are protected. Thus, it argues, its handling of the Chambers matter and its processing of the complaints against him are protected under the First Amendment. The Conference further argues that the jury's consideration of Chambers' history with the Conference under theories of negligent hiring or supervision infringes upon protected beliefs.

In both *Destefano v. Grabrian*, 763 P.2d 275 (Colo.1988) and *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994), our supreme court held that claims of breach of fiduciary duty, negligent hiring or supervision, and vicarious liability in civil actions against clergy members and their supervisors are viable if they are supported by competent evidence in the rec-

ord. Notwithstanding the Conference's assertions that those cases were wrongly decided, they are controlling precedent dispositive of the Conference's arguments. *See also DeBose v. Bear Valley Church of Christ*, 890 P.2d 214 (Colo.App.1994) (*cert. granted* June 19, 1995).

Furthermore, we note that neither Chambers nor the Conference contend that Chambers' method of communicating with parishioners by touching, hugging, and expressing affection was based on any religious tenet or belief. *Cf. DeBose v. Bear Valley Church of Christ, supra.* Therefore, we conclude that the trial court properly rejected the Conference's defense based on the First Amendment.

### II.

Next, the Conference and Chambers each contend that there was insufficient evidence of a fiduciary relationship with Winkler to create liability. We disagree.

■ The existence of a fiduciary relationship is a prerequisite to a finding of a fiduciary duty. A fiduciary relationship may arise when one person occupies a superior position relative to another. *See Moses v. Diocese of Colorado, supra;* Restatement (Second) of Torts § 874 (1979).

■ A fiduciary is a person having a duty, created by his or her undertaking, to act primarily for the benefit of another in matters connected with the undertaking. A fiduciary's obligations include a duty of loyalty, a duty to exercise reasonable care and skill, and a duty to deal impartially with beneficiaries. *Destefano v. Grabrian, supra.*

■ Fiduciary liability requires not only a repose of trust, but an assumption of a duty and a breach of that duty. Whether a fiduciary relationship exists is a question of fact to be resolved by the jury. *Moses v. Diocese of Colorado, supra.*

■ Winkler asserts that Chambers entered into a fiduciary relationship with her by counseling her on personal matters. She testified that the counseling sessions frequently took place on an informal basis and that during these sessions they discussed

numerous intimate matters involving herself and her family. She further argues that Chambers breached his fiduciary duties to her by his conduct.

Chambers argues that the evidence does not support the proposition that there was any counseling relationship, but rather, at most, that he and Winkler had a normal clergy-parishioner relationship, which is not necessarily fiduciary in nature.

With respect to the Conference, Winkler asserts that a fiduciary relationship was created by the Conference assuming control of the investigation of her complaints and those of others. Winkler argues that such a fiduciary relationship was created by: (1) the Conference's actions at the April 24, 1992, meeting at which the Conference seemed very concerned about the women and wanted them to stay together and be supportive of each other; (2) the Conference providing a therapist to help the women; and (3) the Conference preparing and sending a letter to the Grace Church congregation stating that:

> We are equally concerned for the healing of any persons who have been hurt. They will continue to receive appropriate help for their healing and restoration.

Based on these actions, Winkler testified that she trusted the Conference and felt that it would take care of and protect her.

Winkler argues that the Conference breached its fiduciary duties to her by: (1) failing to provide adequate counseling to the affected women; (2) undermining the credibility of the women by telling the congregation of Grace Church that there was nothing in Chambers' personnel file that indicated he had problems; (3) failing to protect the women who had brought complaints against Chambers from ensuing verbal attacks that were directed towards the women, who remained unidentified, as a group; and (4) not sending a letter to the congregation stating that it had found the women's complaints credible.

The Conference contends that it was engaged only in the processing of the complaints and that it did not assume a duty to act in Winkler's best interest.

Here, the jury was instructed on the requisite elements of a fiduciary relationship and determined that a fiduciary relationship existed between Winkler and Chambers and Winkler and the Conference, that Chambers and the Conference breached that duty, that Winkler suffered damages as a result, and that Winkler's damages were proximately caused by the respective breaches. That determination will not be reversed if there is a reasonable basis in the record to support it. See Moses v. Diocese of Colorado, supra.

Based on our review of the record, though the evidence is conflicting, we conclude that there is sufficient evidence from which the jury could determine that Chambers and the Conference each entered into a fiduciary relationship with Winkler and that Chambers and the Conference breached their fiduciary duties. Therefore, the trial court did not err in instructing the jury on the fiduciary issue claims.

We reject the Conference's contention that it is immune from liability under § 13–21–116, C.R.S. (1987 Repl.Vol. 6A). There is no showing here that the Conference was a volunteer organization or that it accomplished its work through unpaid volunteers. See Jones v. Westernaires, Inc., 876 P.2d 50 (Colo.App.1993).

### III.

The Conference also contends that Winkler's action is barred by the applicable statute of limitations. In particular, the Conference asserts the trial court erred by not instructing the jury to determine on what date Winkler's claims of negligent hiring or supervision accrued and that the Conference was not responsible for any alleged negligent supervision that occurred prior to January 22, 1991, two years before Winkler filed this action. We disagree.

A cause of action accrues on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence. Section 13–80–108(1), C.R.S. (1995 Cum.Supp.); Mastro v. Brodie, 682 P.2d 1162 (Colo.1984).

The time when a plaintiff discovered, or through the use of reasonable diligence

should have discovered, the negligent conduct is normally a question of fact which must be resolved by the trier of fact, in this case a jury. However, if the undisputed facts clearly show that a plaintiff discovered, or reasonably should have discovered, the negligent conduct as of a particular date, the issue may be decided as a matter of law.

■ The critical inquiry of when an action accrues is knowledge of the facts essential to the cause of action, not knowledge of the legal theory upon which the action may be brought. *Morris v. Geer,* 720 P.2d 994 (Colo. App.1986).

■ Here, Winkler did not know, nor could she be expected to discover, the factual basis for her claims of negligent hiring or supervision until January 1992, when the storeroom incident occurred and Winkler first learned that at least one other woman had similar experiences with Chambers and that the church authorities had been so informed. January 1992 was well within the applicable two-year statute of limitations.

Conversely, we note that the Conference had a continuing duty to supervise Chambers and became liable for his actions when it knew or should have known that his conduct would subject a third party to an unreasonable risk of harm. *See Destefano v. Grabrian, supra.*

Therefore, we conclude that the trial court did not err by not submitting the issue of the date of accrual to the jury.

We also reject the Conference's related argument, based on *Cassidy v. Smith,* 817 P.2d 555 (Colo.App.1991), that if the trial court had determined that each incident created a new claim, the jury should have been instructed that the Conference was not responsible for any alleged negligent supervision occurring prior to January 22, 1991. Because we have concluded that Winkler's claim against the Conference for negligent hiring or supervision accrued within the applicable statute of limitations, such an instruction was not appropriate.

## IV.

The Conference next contends the trial court erred in failing to instruct the jury that it could consider whether Winkler assumed the risk of Chambers' tortious conduct. In addition, the Conference and Chambers contend the jury should have been instructed on the affirmative defense that Winkler failed to mitigate or minimize her damages. Chambers also argues that the jury should have been instructed on comparative negligence principles with regard to Winkler's claims against him. We find no merit in these contentions.

The premise for the Conference's argument that an assumption of the risk instruction was appropriate is that, after the first incident, Winkler knew that when she was alone at church with Chambers he would act improperly towards her. We conclude that this premise is flawed.

### A.

■ An instruction based on assumption of risk may be appropriate with regard to claims for which comparative negligence principles are applicable. *See CJI–Civ.3d* 9:4 (1988) (Notes on Use) (assumption of risk instruction should be given only in comparative negligence cases governed by statute). Comparative negligence is applicable only if there is evidence that would support a finding that both parties are at fault. *See DeBose v. Bear Valley Church of Christ, supra.*

■ Even if we assume that comparative negligence principles may apply to a claim for breach of fiduciary duty or negligent supervision or hiring, an issue not addressed by the parties, we conclude that there is no evidence which would support a finding that Winkler was at fault or had knowledge of the danger to which she was exposed, consented to that danger, and assumed the risk. *See Carter v. Lovelace,* 844 P.2d 1288 (Colo.App. 1992). There is no indication that Winkler's continued contact with Chambers, especially in a counseling relationship, established either fault, consent to a known danger, or assumption of the risk.

Further, the record indicates that Winkler was vulnerable because of her mental state

and that, unless she completely abstained from going to church, contact with Chambers was inevitable. Thus, under such circumstances, we conclude that an assumption of the risk instruction was not supported by the record.

The jury was instructed that it could consider Winkler's comparative negligence with respect to her negligent hiring and supervision claim against the Conference. Without addressing the appropriateness of the instruction, we conclude that the issue of assumption of risk was subsumed in the instructions that were given to the jury. *See Howard v. Wood Bros. Homes, Inc.*, 835 P.2d 556 (Colo.App.1992), *rev'd in part on other grounds*, 862 P.2d 925 (Colo.1993).

■ In light of our previous conclusions, we also conclude that the trial court did not err in failing to instruct the jury on comparative negligence with regard to Winkler's claim for breach of fiduciary duty and outrageous conduct against Chambers. Moreover, Chambers, in effect, by arguing that his actions amounted to battery, admitted that his conduct was intentional. *See CJI–Civ.3d* 20:5 (1989). Accordingly, on that basis, a comparative negligence instruction would not have been appropriate. *See Carman v. Heber*, 43 Colo.App. 5, 601 P.2d 646 (1979) (comparative negligence statute inapplicable to claims based on intentional conduct); *see also* Restatement (Second) of Torts § 481 (1965).

### B.

■ The Conference and Chambers also submitted instructions which provided, respectively, that Winkler had a duty to mitigate her damages (1) by reporting Chambers' offensive conduct to church authorities earlier as a reasonable person would have done under similar circumstances and (2) by continuing to have contact with Chambers without requesting that he stop the offensive conduct. In light of our determination that instructions based on assumption of the risk and comparative negligence were not appropriate, the trial court did not err in refusing to submit the tendered instructions on failure to mitigate damages to the jury.

Moreover, the jury was instructed that it could consider whether Winkler failed to mitigate damages by not promptly obtaining appropriate therapeutic or medical care. We conclude that this instruction adequately set forth the extent of Winkler's duty to mitigate or minimize her damages in this case.

### V.

Relying on *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295 (Ky.App.1993), Chambers asserts that the trial court erred in instructing the jury on outrageous conduct rather than on the more "traditional" and "well-recognized" tort of battery. In this regard, Chambers argues that the tort of outrageous conduct cannot lie to redress conduct constituting battery. Chambers further asserts that characterizing conduct amounting to battery as outrageous conduct should not extend the statute of limitations. We disagree with both assertions.

### A.

■ Chambers' first argument ignores the history of the tort of outrageous conduct in Colorado. Our supreme court first recognized the tort in *Rugg v. McCarty*, 173 Colo. 170, 177, 476 P.2d 753, 756 (1970), in which it stated that to be actionable, the conduct for which redress is sought must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

■ Outrageous conduct is an independent tort which, if proved, entitles the plaintiff to compensatory damages. *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (Colo.1988). The theories of outrageous conduct and battery overlap, and depending on the facts of the case, they may coexist, or either may exist without the other. *See Enright v. Groves*, 39 Colo.App. 39, 560 P.2d 851 (1977) (actions of a police officer in arresting a woman supported separate claims for battery and outrageous conduct). Moreover, we note that our supreme court has recognized the tort of outrageous conduct as an appropriate cause of action in a suit involving the

misconduct of a clergyman. *See Destefano v. Grabrian, supra.*

### B.

■ Since outrageous conduct is a separate tort which may be premised on conduct amounting to a battery, it follows that an action with respect thereto is not barred by the statute of limitations relating to battery.

Actions based on battery are barred one year after both the injury and the cause are known or should have been known by the exercise of reasonable diligence. Sections 13–80–103(1)(a), C.R.S. (1987 Repl.Vol. 6A) and 13–80–108(1). The limitation period applicable to outrageous conduct is two years from the date of accrual. Sections 13–80–102(1)(a), C.R.S. (1995 Cum.Supp.) and 13–80–108(1). The storeroom incident occurred in early January 1992, and Winkler commenced this action on January 22, 1993, presumably more than one year later.

■ In addition, in those instances in which a claim may be pursued on two theories having different limitations on actions, the longer limitation applies. *Jones v. Cox,* 828 P.2d 218 (Colo.1992). Thus, the outrageous conduct claim, having been filed within two years of the storeroom incident, was timely.

Hence, the trial court did not err in instructing the jury on Winkler's claim of outrageous conduct, nor was the action barred by the statute of limitations relating to battery.

### VI.

Chambers next contends that the trial court erred in admitting testimony from other women who testified that he engaged in similar misconduct with them. We disagree.

■ Similar transaction evidence, while more commonly proffered in criminal cases, may be utilized in civil cases if it is relevant to the issues. *See Munson v. Boettcher & Co.,* 832 P.2d 967 (Colo.App.1991), *aff'd,* 854 P.2d 199 (Colo.1993). Such evidence may be used to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." CRE 404(b).

To be admissible, it must satisfy the four-part test set forth in *People v. Spoto,* 795 P.2d 1314 (Colo.1990). *See also DeBose v. Bear Valley Church of Christ, supra.*

■ Here, the other women testified that Chambers engaged in inappropriate touching and made unwanted verbal comments to them. Thus, the testimony met the threshold requirement of similarity.

We further conclude that the evidence was admissible under *People v. Spoto, supra.* The evidence related to a material issue of fact, *i.e.,* whether Chambers' conduct towards Winkler was intentional and with improper motive, or accidental. It was logically relevant because the other incidents tended to negate Chambers' argument that the touching was accidental and that his comments were not inappropriate. Thus, the logical relevance of the evidence was independent of the prohibited inference that Chambers had a bad character and acted in conformity with that character. The fact that such an inference may be drawn does not render the evidence inadmissible. Furthermore, we conclude that the trial court did not abuse its discretion in finding that the prejudicial effect of the evidence was outweighed by its probative value. *See People v. Spoto, supra; DeBose v. Bear Valley Church of Christ, supra.*

### VII.

■ The Conference next contends that the trial court erred in entering judgment for costs against it based on an offer of settlement (offer of judgment) to multiple defendants that did not apportion the settlement amongst the various defendants. We agree.

In *Taylor v. Clark,* 883 P.2d 569, 571 (Colo. App.1994), a division of this court held that § 13–17–202 does not apply to an unapportioned offer of settlement made by a defendant to more than one plaintiff, reasoning that:

The effectiveness of the statute is based on the ability of parties accurately to assess the value of their claims at issue and compare that value with a settlement offer. Such a comparison becomes difficult, however, when a defending party makes a

lump sum offer to multiple parties with distinct interests.

Further, since an unapportioned offer can only be accepted by all the offerees acting in unison, an individual offeree cannot independently weigh the benefit of accepting an unspecified portion of the offer against the likelihood of receiving a less favorable judgment. Thus, an unapportioned offer to multiple parties takes away the individual offeree's ability to make a meaningful choice between accepting the offer or continuing with the litigation, and application of the statute under these circumstances does not comport with the policy of encouraging the settlement of lawsuits.

Relying on *Anderson v. Dunton Management Co.*, 865 P.2d 887 (Colo.App.1993), Winkler argues that because the judgment obtained against the Conference individually, including interest and costs, exceeded the settlement offer to all three defendants, the statute is applicable. However, we conclude that the reasoning set forth in *Taylor v. Clark, supra,* is dispositive.

Therefore, we conclude that the trial court erred in awarding Winkler costs based on the offer of settlement statute and that the judgment should be reduced by $2,918.58, the amount of that award.

## VIII.

■ The Conference next contends that the trial court improperly imposed joint and several liability on it for the costs awarded Winkler. We disagree.

Section 13–16–104 provides that a successful plaintiff shall recover his or her costs incurred in an action against a defendant. This section does not expressly provide for, or preclude, a pro rata assignment of costs amongst litigants.

The Conference contends that the imposition of joint and several liability for costs is contrary to principles of tort reform in general and more specifically to the concept of pro rata liability embodied in the doctrine of comparative negligence set out in §§ 13–21–111 and 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A). The Conference argues that the trial court should have allocated the amount of costs entered against each defendant on a pro rata basis in the same percentage as the jury verdict against each defendant as to the total jury verdict. Thus, on that basis, the Conference would be liable for approximately 65% of the costs.

In *Cobai v. Young,* 679 P.2d 121 (Colo.App. 1984), a division of this court held that a trial court may allocate costs between defendants. *See also* §§ 13–16–108 and 13–16–109, C.R.S. (1987 Repl.Vol. 6A). This result is essentially what the Conference advocates here. However, the court in *Cobai* implicitly held that the trial court's right to allocate costs between defendants is discretionary.

Because we conclude that, under the circumstances present here, the trial court did not abuse its discretion in making the award of costs against the defendants joint and several, we will not overturn that award on appeal. *See Poole v. Estate of Collins,* 728 P.2d 741 (Colo.App.1986)

## IX.

Finally, the Conference contends that the trial court erred by failing to advise the jury of the amount of the settlement that Winkler entered into with Grace Church and by failing to offset that amount from the verdict. Under the circumstances here, we disagree.

■ Here, the Conference chose not to designate Grace Church as a liable non-party because such a designation would have been inconsistent with its defense that neither it nor the church was negligent. In light of that strategic decision, the jury was not permitted to apportion the degree of fault attributable to the settling party. Thus, the trial court did not err in not subtracting the amount of the settlement from the verdict. *See Smith v. Zufelt,* 880 P.2d 1178 (Colo. 1994) (verdict may be reduced only by the cumulative percentage of liability attributable to any settling parties by the jury).

We reject the Conference's argument that the jury should have been instructed in accordance with *Greenemeier v. Spencer,* 719 P.2d 710 (Colo.1986). That case was decided prior to the present statutory scheme relating to apportionment of damages with desig-

nated non-parties and contributions among joint tortfeasors. In any event, the jury was informed that Grace Church had been a party and had settled, but it was not so instructed.

### X.

The judgment awarding Winkler $2,918.58 in costs based on an offer of settlement is reversed. The balance of the judgment is affirmed.

RULAND and ROTHENBERG, JJ., concur.